IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 18, 2017 Session

## FERRYL THERESITA McCLAIN v. RICHARD PERRY McCLAIN

**Appeal from the Circuit Court for Washington County**
**No. 33126     Jean A. Stanley, Judge**

---

**No. E2016-01843-COA-R3-CV**

---

This is a post-divorce child custody action involving two children, who were sixteen and seventeen years of age at the time of the most recent trial. The parties were divorced by order of the Sullivan County Law Court ("divorce court") in July 2001. Concomitant with the divorce decree, the divorce court entered a permanent parenting plan designating the father as the primary residential parent. Although the permanent parenting plan was modified in 2003 and 2007, the divorce court had most recently modified the permanent parenting plan in February 2009 ("2009 PPP") upon the parties' stipulation that a material change in circumstance had occurred. The divorce court maintained the father's designation as the primary residential parent and awarded to the father 268 days of annual residential co-parenting time as compared to Mother's 97 days. At some point following entry of the 2009 PPP, the mother relocated to Texas, and the father and the children relocated to Washington County, Tennessee. Upon the mother's request, the case was transferred to the Washington County Circuit Court ("trial court") in April 2014. On March 20, 2015, the mother filed a motion in the trial court to modify custody and child support, as well as a motion for civil and criminal contempt against the father, alleging various violations of the 2009 PPP. Following a hearing regarding the contempt allegations, the trial court entered an order on June 30, 2015, finding the father in "technical contempt" and directing him to pay an expert witness fee as a sanction. Following participation in mediation, the parties announced an agreement, which the trial court ratified in a permanent parenting plan order entered on June 30, 2015 ("2015 PPP"). The 2015 PPP maintained the father's designation as the primary residential parent and provided the mother with 85 days of residential co-parenting time, a great part of which was to be exercised at her residence in Texas. On October 2, 2015, the mother filed an "emergency motion" for modification of the 2015 PPP, as well as for criminal and civil contempt against the father, averring violations of the 2015 PPP. The parties subsequently filed competing "emergency" motions concerning physical custody of the younger child, who under one temporary order entered by the trial court in October 2015, was to reside primarily with the mother. Following a two-day bench trial in October 2015, the trial court maintained the prior designation of Father as the primary residential

parent for both children pending further order, but the court took the custody matter under advisement pending receipt of a court-ordered assessment of the parties and the children by a forensic psychologist. Upon receipt of the psychologist's report, the trial court conducted a second two-day bench trial in June 2016, ultimately finding that this was a case of severe parental alienation in which the father had actively supported the children's alienation from the mother without reasonable cause. The court awarded exclusive custody of the children to the mother and directed that the children participate with the mother in a workshop in California that had been recommended by the forensic psychologist as a therapeutic methodology for parental alienation at an estimated cost of approximately $28,000.00. The court directed that the workshop costs, including a mandatory post-workshop vacation for the mother and the children, would be substantially paid by the father. The court further found, *inter alia*, that the father was in contempt of court for failing to follow certain provisions of the 2015 PPP and sentenced the father to eight days in jail, with the sentence suspended provided no further violations occurred. Also finding that the mother was entitled to attorney's fees, the court reduced the $38,594.99 fee amount requested by the mother to an award of $20,000.00 to offset the amount paid by the father toward the workshop. The father has appealed. Having determined that the father was not provided with sufficient notice of criminal contempt charges pursuant to Tennessee Rule of Criminal Procedure 42(b), we vacate the trial court's order finding the father in contempt. We remand for a determination of whether the amount of attorney's fees awarded to the mother was appropriate given our vacation of the contempt finding against the father. We affirm the trial court's judgment in all other respects. The mother's request for attorney's fees on appeal is denied.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Vacated in Part, Affirmed in Part; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and J. STEVEN STAFFORD, P.J., W.S., joined.

Lois B. Shults-Davis, Erwin, Tennessee, for the appellant, Richard Perry McClain.

Ronald D. Tuech, Mountain Home, Tennessee, for the appellee, Ferryl Theresita McClain.

**OPINION**

I. Factual and Procedural Background

The plaintiff, Ferryl Theresita McClain ("Mother"), and the defendant, Richard Perry McClain ("Father"), had two sons born of their marriage: B.M. in August 1998 and

C.M. in June 2000 (collectively, "the Children"). Following entry of the initial permanent parenting plan order in December 2001, Mother appealed the divorce court's designation of Father as the primary residential parent to this Court, which affirmed the divorce court's judgment. *See McClain v. McClain*, No. E2002-00913-COA-R3-CV, 2003 WL 1452958 (Tenn. Ct. App. Mar. 21, 2003) ("*McClain I*"). In *McClain I*, this Court set forth the factual history leading to the initial designation of Father as the primary residential parent as follows:[1]

> Mother was a licensed pharmacist, but she apparently did not work as such after the birth of the parties' first child. Mother and Father co-owned a computer information systems company. The company solicited contracts from large corporations to integrate their computer systems. Father did all of the hands-on work for the company, traveling to the various client sites. Mother assisted with the bookkeeping.
>
> In April, 1999, following an argument between the parties as to whether Mother should travel to Ohio to see her brother's newborn baby, Mother withdrew $5,000 from the parties' joint bank account, and took eight-month-old [B.M.] and drove to Ohio, without informing Father. Mother contends that she and Father were having problems and that she "needed some time away from him to think." Mother left on a Friday and returned to Kingsport the following Monday.
>
> Later that same month, Mother voluntarily admitted herself to Indian Path Pavilion Hospital, suffering from depression. As a part of her hospitalization, she sought help in coping with emotional issues associated with her marriage. She was evaluated by a psychiatric social worker who later testified at trial that Mother was not suicidal and that she posed no risk of harm to herself or to others.
>
> On June 1, 1999, Mother filed for divorce on the ground of inappropriate marital conduct. A few months later, Mother learned that she was pregnant with the parties' second child. In November, 1999, at the parties' request, the trial court entered an order of reconciliation, which

---

[1] On appeal in the present action, Father sets forth detailed facts surrounding the dissolution of the marriage while Mother objects to inclusion of events occurring prior to entry of the 2015 PPP as irrelevant. Having determined that the record documenting facts surrounding the divorce and subsequent modifications of the initial permanent parenting plan was before the trial court and that *McClain I* is a matter of public record, we include a background of events occurring prior to entry of the 2015 PPP insofar as we determine such events to be relevant to the original designation of a primary residential parent and the progression of modifications to the parties' original permanent parenting plan order.

3

expressly suspended the divorce proceedings for six months. The parties' second child, [C.M.], was born the following June.

In July, 2000, the parties and their children went to Louisiana. The purpose of the trip was to attempt to reconcile Mother with her estranged father at a family reunion. While in Louisiana, the parties had several disagreements, which resulted in Mother leaving Louisiana with [C.M.] and flying to Houston to stay with her sister and brother-in-law. Father returned to Kingsport with [B.M.]. A week and a half later, Father flew to Houston with [B.M.]. When the parties met in Houston, Mother told Father that she was taking the children and driving to her sister's house to spend the night. Mother assured Father that she and the children would return the next day at 1:00 p.m. Despite this understanding, Mother changed her mind, after deciding that she needed some time away from Father. Acting on the advice of her then-attorney, she withdrew $50,000 from the parties' joint bank account, took the children, and drove to Austin to stay with a friend. Mother did not contact Father to tell him she was taking this action. While Mother's sister and brother-in-law knew where Mother was, they were instructed by Mother not to tell Father.

Three weeks later, Mother returned to Houston with the children. During the entire three-week time period, Father had no idea where Mother and the children were. While she was away, Mother filed a motion to set aside the order of reconciliation. Father answered the divorce complaint and filed a counterclaim for divorce, which was also premised upon the ground of inappropriate marital conduct.

In September, 2000, the trial court held hearings for the sole purpose of determining a temporary parenting plan. At the conclusion of the hearings, the court entered an order on September 18, 2000, in which it named Father the temporary primary residential parent. The court based its decision on numerous factors, including Mother's health care philosophy, the court's concern about Mother's mental well-being, and its concern about Mother secreting the children at locations unknown to Father. Mother was granted visitation with the children every other weekend from 6:00 p.m. on Friday until 7:00 p.m. on Sunday, and on weekdays from 3:00 p.m. until 7:00 p.m.

A further hearing was conducted by the trial court in July, 2001. On July 31, 2001, the court entered a judgment of divorce, which granted the parties a divorce on a stipulated ground and divided the parties' marital

property. The judgment also modified the visitation arrangement to reflect the fact that the older child was then in daycare. The court noted that Father remained the primary residential parent of the children.

In September, 2001, following another hearing, the court designated Father as the primary residential parent of the children, granted Mother certain visitation rights, and adopted Father's proposed parenting plan. The court's ruling was memorialized by a final order in December, 2001.

*Id.* at *1-2 (footnote omitted).

In April 2014, when Wife's former counsel, Judith Fain, requested that the case file in this matter be transferred from the divorce court to the trial court, the parties' co-parenting arrangement was governed by the 2009 PPP, which had been entered by the divorce court upon the parties' stipulation that a material change in circumstance had occurred since entry of a prior modified permanent parenting plan order in 2007. In the 2009 PPP, the divorce court designated Father as the primary residential parent of the Children, providing him with 268 days of residential co-parenting time as compared to Mother's 97 days and granting all major decision-making authority to Father. The residential co-parenting schedule, which did not reference Mother's subsequent relocation to Texas, provided her with co-parenting time during the academic year on alternate weekends and during the summer on alternate weeks. As part of the 2009 PPP, Mother was ordered to pay $1,113.00 in monthly child support, and Father was ordered to maintain health and dental insurance for the Children, with uncovered expenses to be split *pro rata* according to the parties' respective incomes. The parties agreed through the 2009 PPP to each maintain $200,000 in life insurance with the other party to be named as primary beneficiary in trust for the benefit of the Children.

On March 20, 2015, Mother filed in the trial court a "Motion for Civil Contempt, to Modify Custody, to Modify Child Support, for Alternative Relief and for Additional Relief." Mother alleged various violations of court orders, including that Father had (1) begun denying Mother her in-person and telephonic co-parenting time in 2011, culminating in his refusal to allow her co-parenting time in the summer of 2014 and winter holiday break in 2014-2015; (2) violated the prohibition in the 2009 PPP against scheduling appointments for the Children during the other parent's co-parenting time without the other parent's permission; (3) violated a December 16, 2013 agreed order to bring the Children and himself to counseling sessions with Brian Scott, LPC, on at least two occasions; and (4) alienated the Children against Mother in violation of the provision in the 2009 PPP that "[t]he mother and father . . . will encourage each child to continue to love the other parent and be comfortable in both families." Mother thereby averred that a material change in circumstance had occurred since entry of the 2009 PPP and requested

5

that she be designated the primary residential parent of the Children and that Father be required to undergo a psychological assessment.

Father filed an answer and counter-motion on May 11, 2015, also averring a material change in circumstance since entry of the 2009 PPP. In his answer, Father admitted the existence of the December 16, 2013 agreed order, apparently entered by the divorce court, directing the parties to counseling with Mr. Scott. We note, however, that this agreed order is not in the record on appeal. In his counter-motion, Father asserted that the Mother's relocation to Texas, coupled with the Children's lack of desire to visit with Mother and allegedly erratic and frightening behavior exhibited by Mother during the spring of 2014 constituted a material change in circumstance. Father requested a modification reducing Mother's annual co-parenting time to 27 days annually. As to Mother's allegations of contempt, Father acknowledged that Mother had missed some co-parenting time with the Children but asserted that Father's actions were not the cause because the Children had refused to go with Mother. Father acknowledged that the last time he had met with Mr. Scott was on March 18, 2014. He stated that he no longer believed it was in the best interest of the Children to be under the care of Mr. Scott because during the last session Mr. Scott refused to address "any of the issues and trauma that the children had experienced during their visit with the Mother in Texas during the spring of 2014," Father requested that the trial court appoint a different counselor to provide therapy to the Children.

Following a hearing conducted on May 21, 2015, regarding Mother's contempt allegations, the trial court entered an order on June 30, 2015, finding Father in "technical contempt" of the 2009 PPP for, *inter alia*, influencing the Children to prevent visitation with Mother during the summer and Christmas vacations in 2014. As sanctions, the court ordered Father to pay a $600 fee for Mr. Scott's expert witness testimony and Mother's attorney's fees related to the contempt petition.

In the meantime, the parties had successfully participated in mediation on May 22, 2015, and the trial court ratified the parties' mediated agreement as the 2015 PPP on June 30, 2015. In the 2015 PPP, the trial court continued Father's designation as the primary residential parent and provided Mother with 85 days per year of residential co-parenting time, including much of the Children's summer vacations and some holidays. The 2015 PPP also provided that the Children would continue counseling with Mr. Scott, who was based in Tennessee, via a video-conferencing software application, either FaceTime or Skype, during the summer months and in person when the Children returned to Tennessee. The parties agreed to abide by Mr. Scott's recommendations. The court also in the 2015 PPP (1) designated Father as the major decision-maker, (2) set up a system whereby Mother could initiate holiday weekend visits with the Children either in Texas or Tennessee with fourteen days' notice provided she paid applicable transportation costs,

(3) set forth the parents' agreement that the Children were old enough to travel by air without supervision, (4) directed that Father was to maintain health and dental insurance for the Children with uncovered expenses to be split equally between the parents, and (5) directed that the parents maintain respective life insurance policies on themselves in the minimum amount of $75,000 each.

On October 2, 2015, Mother filed an "Emergency Motion for Custody, to Modify the Parenting Plan, for Criminal and Civil Contempt, for Alternative Relief and for Additional Relief," along with a proposed permanent parenting plan. Mother attached several exhibits to the emergency motion, including a report from Mr. Scott, filed under seal, describing B.M.'s admission to Kingwood Pines ("Kingwood"), a psychiatric hospital in Texas, during Mother's summer 2015 co-parenting time with the Children, as well as photocopies of text messages sent between B.M. and Father and B.M. and his paternal grandmother during Mother's co-parenting time. Mother had discovered the text messages on B.M.'s cellular telephone when B.M. was admitted to Kingwood. A written order entered by the trial court on October 9, 2015, indicates that the court conducted a hearing on Mother's emergency motion on October 5, 2015, with counsel for both parties appearing and Mr. Scott appearing via telephonic conference.

Following the hearing, the trial court set a trial date for November 2015 and ruled that in the interim, Mother would be afforded telephonic co-parenting time twice weekly with the Children and would exercise her "Fall break" co-parenting time with C.M. by picking him up on October 5, 2015, and returning to Texas with him for the duration of the break from school. The trial court ruled that C.M. could continue to see Faith Mahoney, LPC, a counselor with Frontier Health in Johnson City, whom Father had retained. Finally, the court appointed forensic psychologist, Thomas Schacht, Ph.D., to conduct "full psychological testing" of the parents and B.M. and file a report with the court. The court approved as requested by Dr. Schacht a list of items to which he needed access to facilitate his evaluation. The court entered an order memorializing its October 5, 2015 ruling on October 9, 2015.

Also on October 9, 2015, Mother filed an "Emergency Ex Parte Motion for Temporary Restraining Order, for the Youngest Child to Remain in Texas and for Additional Relief," alleging that since the trial court's ruling on October 5, 2015, "a substantial and material change of circumstances [had] occurred warranting the immediate involvement" of the court to protect C.M. from "substantial irreparable harm." Mother averred in the motion that on the day her fall break co-parenting time was to begin, Father had brought C.M. to the exchange location, a McDonald's restaurant in Johnson City, Tennessee, but that C.M. had been unwilling to transfer to Mother's vehicle because he had been told by Father that Father could be arrested for allowing his child to cross the state line if the child did not want to go. According to Mother, she was

7

not able to leave with C.M. until after she had made a telephone call to Child Protective Services in Texas, assuring C.M. that Father would not be arrested, and a call to the Johnson City Police Department "to effectuate the child's transition to [Mother's] vehicle."

Mother further alleged that less than twenty-four hours after leaving the McDonald's parking lot with C.M., she received the following text message from B.M.:

> Oh I forgot to block you at least satan still hasn't blocked you from hell I guess one day I will see both of you burning below me I hope you enjoy your last vacation with your favorite child.

Averring that B.M.'s text message appeared to threaten her safety and C.M.'s safety, Mother requested, *inter alia*, that the trial court enter an *ex parte* temporary restraining order prohibiting C.M. from returning to Father's residence and enjoining Father from coming about Mother's residence. During trial later in October 2015, B.M. admitted sending this text message but insisted that by "both of you," he had meant Mother and his maternal grandfather, who had passed away in the year preceding trial. B.M. acknowledged that the message could have been interpreted in a way he did not intend.

The trial court conducted a hearing on October 9, 2015, during which the court heard testimony presented by Father and arguments of counsel for both parties with Mother listening via telephone. Following the hearing, the court ruled that pending further order, C.M. would remain in Texas with Mother, who would have primary decision-making authority for him. The court adjusted child support according to the order and directed that each parent would be afforded telephonic contact with the child not residing with him or her. The court entered an order memorializing this ruling on October 16, 2015.

Meanwhile, C.M. was admitted to Kingwood while in Mother's care on October 14, 2015. Upon Father's subsequent emergency motion to vacate or set aside the October 16, 2015 order, the trial court, with Chancellor John C. Rambo presiding in the trial court judge's absence, entered an order on October 23, 2015, directing that if Kingwood were ready to discharge C.M. before 7:00 a.m. on October 26, 2015, C.M. would be released to Mother but if after that time, he would be released to Father. The court further directed that the parties and the Children would be present for a hearing set for October 27, 2015, before the trial court judge. Father had attached to his motion, among other documents, a statement from Ms. Mahoney, explaining that she had performed a counseling intake at Father's request on C.M. on October 1, 2015, at Frontier Health in Johnson City, Tennessee, and had remained in contact with C.M. while he was in Texas prior to his hospitalization. Ms. Mahoney's attached notes indicated that she had called the local

sheriff's department in Texas on October 14, 2015, after receiving a disturbing telephone call from C.M.

At the beginning of trial on October 27, 2015, Mother filed an "Emergency Motion to Modify Defendant's Parenting Time, for the Youngest Child to Return to Texas, and for Additional Relief." At the close of two days of testimony from the parties, B.M., C.M., Mr. Scott, Ms. Mahoney, and A.Q. (a friend of Mother's), the trial court took the matter under advisement pending receipt of Dr. Schacht's report. The court did, however, issue a memorandum opinion, indicating, *inter alia*, that B.M., who would turn eighteen in August 2016, would not be required to return to Mother's care. The court also ordered that C.M. would reside with Father but emphasized that this decision was temporary pending receipt of Dr. Schacht's report, which was now to include evaluation of the parties and both Children. The court entered an order memorializing its memorandum opinion on June 27, 2016. Mother had subsequently filed a "Motion for Civil Contempt" on June 17, 2016, alleging, *inter alia*, that Father had allowed the Children to block Mother's attempted communication to their cellular telephones and had failed to timely inform Mother of C.M.'s hospitalization for a medical procedure in February 2016, the Children's academic grades and attendance records, and B.M.'s academic awards and corresponding school ceremony.

The trial court entered an order on March 10, 2016, notifying the parties that it had received and placed under seal a report from Dr. Schacht, copies of which were disseminated to the parties' respective counsel. In his report, Dr. Schacht concluded that the Children were "alienated from their mother, not justifiably estranged, and the alienation appears to be supported by the actions and statements of others, including at least their father and paternal grandmother." He noted that his report was based on review of all materials provided to him, including "clinical, school, and litigation records, as well as family documents/photos and various communications (text messages) as provided by counsel for both parties," in addition to interviews with Mother, Father, B.M., C.M., the Children's teachers, and the principal of the Children's high school.

Dr. Schacht generally defined parental alienation in his report as follows:

Divorce inevitably presents a child with the challenge of navigating a shared relationship between parents who sometimes continue their conflict even after the divorce. Children respond differently to this situation depending on their pre-existing personalities and on the unique and evolving characteristics and vicissitudes of their particular families. At various times following a divorce, children may accept both parents, may align with one parent, may pursue neutrality and avoid aligning with either

9

parent, may reject both parents, or may inhabit an unstable interpersonal realm of shifting parental allegiances.

Alienation and estrangement, as psychological terms of art that may describe some of these family dynamics, are not interchangeable or synonymous concepts.

The difference between estrangement and alienation resides in the presence vs absence of a reasonable objective basis for a child's severe and persistent rejection and denigration of a parent. Rejection and denigration of a parent with a reasonable objective basis is estrangement; rejection and denigration without such a basis is parental alienation.

Despite incorporation of the word "parental," parental alienation is primarily a description of the psychological condition of [a] child. The term does not describe the condition or actions of a parent. As set forth in Bernet et al (2010):

> "[T]he essential feature of parental alienation is that a child . . . allies himself or herself strongly with one parent (the preferred parent) and rejects a relationship with the other parent (the alienated parent) without legitimate justification. The primary behavioral symptom is that the child refuses or resists contact with a parent, or has contact with a parent that is characterized either by extreme withdrawal or gross contempt. The primary mental symptom is the child's irrational anxiety and/or hostility toward the rejected parent. This anxiety and/or hostility may have been brought about by the preferred parent or by other circumstances . . ."[FN]

The phenomena of parental alienation are well recognized internationally and, sadly, are frequently alleged or encountered in custody and visitation litigation. Parental alienation may occur in the absence of any other mental condition. The specific term "parental alienation" does not yet appear as a psychiatric diagnosis in the official classification of the American Psychiatric Association, although its features commonly may be subsumed under one or more other diagnostic categories, such as Parent-Child Relational Problem, Separation Anxiety Disorder, and Shared Delusional Disorder (a/k/a *folie a deux*).

10

[FN] Bernet, W. et al. (January 15, 2010) Parental alienation, DSM-V, and ICD-11. Draft report for submission to the DSM5 Task Force Disorders of Child and Adolescence Work Group, p. 12.

Following receipt of Dr. Schacht's report, the trial court conducted a second bench trial over the course of two days on June 28 and 29, 2016, hearing testimony from the parties, B.M., Dr. Schacht, Ms. Mahoney, and a private investigator who could potentially assist with transporting the Children. At the close of trial, the court credited Dr. Schacht's opinion to find that "severe" parental alienation had occurred. In a memorandum opinion, subsequently incorporated into a permanent parenting plan order entered on July 18, 2016 ("2016 PPP"), the trial court described four options presented by Dr. Schacht: (1) grant Father exclusive custody of the Children and require no visitation with Mother (referred to as leaving the status quo in place); (2) continue Father's designation as primary residential parent and renew efforts to remedy alienation against Mother through education, counseling, and parenting coordination; (3) place the Children in a neutral setting apart from both parents; or (4) place the Children with Mother as the primary residential parent and suspend all contact with Father pending the Children's demonstrated progress in their relationship with Mother.[2]

In reviewing the fourth option, the trial court described the workshop recommended by Dr. Schacht, known as the Family Bridges Workshop ("Family Bridges"), which could be made available to Mother and the Children in California. The court determined that the fourth option, with direction that Mother and the Children would participate in Family Bridges or in a treatment plan with a comparable methodology, would be in the best interest of the Children. In its memorandum opinion, the court expressly considered the statutory best interest factors provided in Tennessee Code Annotated § 36-6-106(a) but did find that some factors, such as each child's relationship with each parent and each child's expressed preference, were "skewed" by parental alienation. The court credited Dr. Schacht's opinion in finding that suicidal ideation expressed by B.M. and C.M. during their respective 2015 psychiatric hospitalizations had been "driven mostly to control outcomes, as opposed to true expressions of the desire to hurt themselves."

The trial court in its memorandum opinion found that both parents were capable of providing for the physical and financial needs of the Children. Upon finding that Father had the greater income, the court directed that Father would be responsible for two-thirds of the cost of Family Bridges and Mother responsible for the remaining third. Noting that

---

[2] In his report and testimony, Dr. Schacht also presented a fifth option, consisting of the trial court's granting the Children an opportunity to resume the visitation schedule set forth in the 2015 PPP with the understanding that if they "renege[d] on their agreement or escalate[d] conflict," custody would be granted to Mother under either the third or fourth option with court approval.

Mother had been previously diagnosed with bipolar disorder, the court found that Mother "has recognized the problem, has been to the doctor, is on medication, is a pharmacist, has her own home, a full-time job, and her own company." In contrast, the court noted that text messages presented during trial indicated that Father had expressed to B.M. a view that mental illness was a "spiritual problem" that could only be remedied spiritually. The court further credited Dr. Schacht's opinion that Father's influence in this regard posed a potential risk that if the Children's lives were affected by mental illness in the future, they would believe the illness to be an indication of spiritual frailty. We note that during trial, Father expressed his desire that the Children would receive mental health treatment in the future if they were in need of such treatment.

In the 2016 PPP, the trial court designated Mother as the primary residential parent and sole major decision-maker for the Children. As to Father's co-parenting time, the court included in the 2016 PPP the following special provision:

> This Court's ruling on June 29, 2016 is hereby fully incorporated herein. Father shall have no contact with the minor child/ren for at least 90 days beginning with the commencement of the Family Bridges Workshop or blended version of same – as Mother chooses. Father's future parenting time with the child/ren shall be based upon the children's compliance with the Family Bridges Workshop guidelines, and Father['s] compliance with the Court ordered Family Bridges Workshop guidelines and/or those of Dr. Joann Murphey if/as applicable, and the rules and recommendations of Father's aftercare professional – Dr. Martha Rubenstein (Kingsport, TN). Mother is awarded immediate custody of both boys with Mother to choose either a) she and the boys attend a full Family Bridges Workshop and/or b) a blended version of same via the assistance of Dr. Joann Murphey in Texas, who will implement Family Bridges Workshop methodology and develop a treatment plan. For at least 90 days following the Family Bridges Workshop or the blended version of same – as Mother chooses, Mother shall remain at home with the boys and shall not be required to work.
>
> Mother and Father may exchange email correspondence for emergency purposes.
>
> Section VI, below, entitled Rights of Parents, is hereby suspended pending further Order of this Court.

Prior to entry of the 2016 PPP, Mother filed a motion for reimbursement of attorney's fees, costs, expenses, and discretionary costs on July 12, 2016.

On July 20, 2016, Father filed a motion for stay of execution and a separate motion for interlocutory appeal with the trial court, as well as a Tennessee Rule of Appellate Procedure 7 motion with this Court for stay of execution pending appeal. Also on July 20, 2016, the trial court entered separate orders denying Father's respective motions for stay of execution and interlocutory appeal, and this Court entered an order denying the Rule 7 motion.

On July 22, 2016, the trial court entered an "Order on Payment of Funds for Family Bridges Workshop and Mandatory Post Family Bridges Workshop Vacation, and Airline Flight to Houston, Texas for Children," directing Father to purchase airline tickets for the Children and to pay into Mother's counsel's escrow account a total of $29,000.00 to $31,000.00 to be utilized by Mother for the Family Bridges expenses. This total included an estimated $3,000.00 to $5,000.00 in expenses for a post-workshop "vacation" required by Family Bridges as a component of the program. The trial court's memorandum opinion indicates that during the close of trial on June 29, 2016, the court had granted Mother's request that her third of the costs for Family Bridges be deducted from her pending award of attorney's fees.

Upon a subsequent motion for stay of enforcement filed by Father, the trial court entered an order on August 2, 2016, finding that as of 12:01 a.m. on B.M.'s eighteenth birthday in August 2016, the trial court's subject matter jurisdiction over B.M. would end. The court stated that all orders concerning B.M., except those affecting support, "especially those concerning physical custody, parenting time, association with other persons and concerning medical and other such treatment and compulsory participation in any educational process, are void and shall have no effect" as of B.M.'s eighteenth birthday. In separate motions filed respectively by the parties on August 9, 2016, it was undisputed that Mother had notified her counsel and Father that B.M. had been discharged from Family Bridges on August 5, 2016, by the workshop therapists, and Father had arranged for B.M. to return to Tennessee via airline flight the next day.

The parties agreed in their motions that with the return of B.M. to Father in Tennessee, Father should be named B.M.'s primary residential parent from that time forward. In her motion, Mother stated that she and C.M. had successfully completed the Family Bridges Workshop. She requested that the order directing Father to have no contact with C.M. apply to the paternal grandmother and to B.M. now that B.M. was an adult. The trial court subsequently entered an order on August 10, 2016, approving the parties' agreement that Father would once again become the primary residential parent of B.M. as of B.M.'s eighteenth birthday.

The trial court entered a supplemental order on August 10, 2016, directing that a report of the Children's 2015 psychiatric hospitalizations be made to the National Instant

Criminal Background Check system ("NICBC") and that the Children were to have no access to firearms or other weapons. In a memorandum opinion entered on August 25, 2016, the court addressed Mother's motion to alter or amend, finding that the court did not have jurisdiction to enjoin the paternal grandmother or B.M. from contact with C.M. The court further found that although its prior order directing a report to NICBC was valid and "should have already been complied with," B.M. as an emancipated adult, could now act "on his own accord to access firearms and/or weapons."

In the meantime, the trial court entered a separate "Order on Motions for Civil and Criminal Contempt and Order Granting Attorney Fees" on August 5, 2016, referencing evidence presented during the hearing conducted on June 28 and 29, 2016. The court found Father to be in "willful contempt" for violating the court's orders on four counts: (1) failing to notify Mother within twenty-four hours of C.M.'s February 2016 medical hospitalization and treatment, (2) failing to provide Mother with information regarding B.M's academic awards and both Children's academic grades and attendance records, (3) sending "disparaging and damaging statements" against Mother to [B.M.] during Mother's co-parenting time in the summer of 2015, and (4) failing to take the Children to court-ordered counseling with Mr. Scott. The court sentenced Father to eight days in jail but suspended the sentence on the condition that Father commit no additional acts of contempt.

As to Mother's request for reimbursement of fees and costs, the trial court in its August 5, 2016 order awarded to Mother "[a]ll reasonable and necessary court reporter expenses for depositions and trials and all expert witness fees of Thomas Schacht for the entire duration of his presence for the trial of this matter." The court further found that Mother was the prevailing party and acted in good faith in pursuing the motions for contempt and the motion for modification in custody. Noting that Father previously had been ordered to pay a substantial amount toward the cost of Family Bridges, the court found that Father should be responsible for a portion of Mother's attorney's fees rather than the full amount requested of $38,594.99. The court awarded to Mother $20,000.00 as a portion of her attorney's fees.

Father filed a notice of appeal on September 2, 2016, specifying that he was appealing "the order of the Trial Court entered July [18], 2016,[3] which disposed of fewer than all issues in the cause, the order entered August 5, 2016, and the multiple orders and Supplemental Order entered August 10, 2016, disposing of further issues which are final orders for purposes of appeal." We determine that Father's appeal was timely as to the

---

[3] Father's notice of appeal contains an apparent typographical error, stating the date of entry of the 2016 PPP as July 16. The record indicates that the trial court entered the 2016 PPP at issue on July 18, 2016.

final judgment entered August 10, 2016, and was inclusive of the prior orders specified in his notice of appeal.

Following a hearing upon the parties' competing motions for designation of the record, the trial court entered an order on December 16, 2016. The court, *inter alia*, denied Mother's motion to exclude any documents filed prior to the 2015 PPP but directed the parties to mark those documents as "filing only" because the parties could not know whether particular filings were considered by the trial court. The court also directed that certain filings be placed under seal. Upon motions filed by Mother during the pendency of this appeal, this Court entered orders directing that the recording of the parties' oral argument would be excluded from the Internet and that the complete version of Mother's responsive brief would be placed under seal. Upon this Court's direction, Mother subsequently filed a redacted version of the responsive brief for the public portion of the case file.

## II. Issues Presented

Father presents nine issues on appeal,[4] which we have restated as follows:

1. Whether the trial court erred by modifying the 2015 PPP without making a threshold finding of a material change in circumstance.

2. Whether the trial court erred by failing to meaningfully consider the statutory best interest factors provided in Tennessee Code Annotated § 36-6-106(a).

3. Whether the trial court erred by omitting an assessment of the statutory limiting factors on residential co-parenting time provided in Tennessee Code Annotated § 36-6-406.

4. Whether the trial court erred by prohibiting all contact between Father and the Children for at least ninety days pending completion of Family Bridges and Father's cooperation with an after-care professional.

5. Whether the trial court erred by adopting the option of transferring custody to Mother over other options outlined by Dr. Schacht.

---

[4] In his presentation of the issues, Father combines the first two issues listed here. We have isolated the issue of a material change in circumstance for purposes of our analysis due to its significance as a threshold issue.

6. Whether the trial court erred by ordering the Children and Mother to participate in Family Bridges at a cost of approximately $28,000.00 upon the recommendation of Dr. Schacht despite Dr. Schacht's acknowledgment that he had not previously utilized Family Bridges.

7. Whether the trial court erred by ordering Father to pay the majority of the cost of a post-workshop vacation for the Children and Mother required by Family Bridges.

8. Whether the trial court erred by (A) finding that Father was in civil contempt of court and awarding court fees to Mother as the prevailing party and (B) finding that Father was in criminal contempt of court despite Mother's alleged failure to satisfy notice requirements for criminal contempt.

9. Whether the trial court erred by ordering the Children's psychiatric hospitalizations reported to the NICBC.

Mother presents an additional issue, which we have similarly restated as follows:

10. Whether Mother should be reimbursed for her reasonable attorney's fees, costs, and expenses incurred on appeal.

### III. Standard of Review

We review a non-jury case *de novo* upon the record, with a presumption of correctness as to the findings of fact unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000). We review questions of law *de novo* with no presumption of correctness. *Bowden*, 27 S.W.3d at 916 (citing *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 924 (Tenn. 1998)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

An issue regarding the sufficiency of notice provided regarding criminal contempt allegations presents a question of law, which we review *de novo*. *See State ex rel. Farris v. Bryant*, No. E2008-02597-COA-R3-CV, 2011 WL 676162, at *5 (Tenn. Ct. App. Feb. 24, 2011). However, "[a] trial court's use of its contempt power is within its sound discretion and will be reviewed by an appellate court under an abuse of discretion standard." *See McLean v. McLean*, No. E2008-02796-COA-R3-CV, 2010 WL 2160752,

16

at *3 (Tenn. Ct. App. May 28, 2010) (citing *Outdoor Mgmt., LLC v. Thomas,* 249 S.W.3d 368, 377 (Tenn. Ct. App. 2007)).

Likewise, this Court reviews a trial court's award of attorney's fees according to an abuse of discretion standard. *See Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011); *In re Estate of Greenamyre*, 219 S.W.3d 877, 886 (Tenn. Ct. App. 2005) ("[A] trial court will be found to have 'abused its discretion' only when it applies an incorrect legal standard, reaches a decision that is illogical, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party.") (internal citations omitted).

## IV. Modification of 2015 PPP

In his first five issues presented on appeal, Father contends that the trial court erred by modifying the designation of primary residential parent in the 2015 PPP (1) without making a specific finding that a material change in circumstance affecting the Children had occurred, (2) without properly weighing the statutory best interest factors contained in Tennessee Code Annotated § 36-6-106(a), (3) without assessing the statutory limiting factors on residential co-parenting time provided in Tennessee Code Annotated § 36-6-406, (4) by adopting the most drastic option of intervention proffered by Dr. Schacht, and (5) by prohibiting Father to contact the Children for at least ninety days pending completion of Family Bridges and Father's cooperation with an after-care professional. We will address each of Father's issues in turn.

At the time of a divorce when at least one minor child is involved, as occurred in this case, the trial court must "make a custody determination" "on the basis of the best interest of the child." *See* Tenn. Code Ann. § 36-6-106(a) (Supp. 2016) (delineating factors the court shall consider when taking into account the child's best interest). Because Mother in her petition to modify the permanent parenting plan requested that she be named the primary residential parent of the Children rather than Father, this action is considered one for modification of "custody." *See Armbrister v. Armbrister,* 414 S.W.3d 685, 703 (Tenn. 2013) (comparing the standard for an action to modify custody to the standard for an action to modify solely a residential parenting schedule). In considering a petition to modify custody from one parent to the other parent, "the 'threshold issue' is whether a material change in circumstances has occurred after the initial custody determination." *See Kendrick v. Shoemake,* 90 S.W.3d 566, 570 (Tenn. 2002) (quoting *Blair v. Badenhope,* 77 S.W.3d 137, 150 (Tenn. 2002)). Upon a trial court's finding that a material change in circumstance affecting the children has occurred, "it must then be determined whether the modification is in the child[ren]'s best interests." *Kendrick,* 90 S.W.3d at 570 (citing Tenn. Code Ann. § 36-6-106); *see generally Boyer v. Heimermann,* 238 S.W.3d 249, 255 (Tenn. Ct. App. 2007) ("In approaching questions of custody and

17

visitation, the needs of the children are paramount; the desires of the parents are secondary.").

Regarding the standard a petitioning parent must meet to prove a material change in circumstance sufficient for consideration of whether custody modification is in the best interest of the child, Tennessee Code Annotated § 36-6-101(a)(2)(B) (Supp. 2016) provides in pertinent part:

> (B)    If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a preponderance of the evidence a material change in circumstance. A material change of circumstance does not require a showing of substantial risk of harm to the child. A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.
>
> (i)    In each contested case, the court shall make such a finding as to the reason and the facts that constitute the basis for the custody determination.

*See also Armbrister,* 414 S.W.3d at 703.

As this Court has explained:

> There are no bright line rules for determining when a change of circumstances should be deemed material enough to warrant changing an existing custody arrangement. *Kendrick v. Shoemake,* 90 S.W.3d at 570; *Taylor v. Taylor,* 849 S.W.2d [319,] 327 [(Tenn. 1993)]; *Solima v. Solima,* 7 S.W.3d [30,] 32 [(Tenn. Ct. App. 1998)]. These decisions turn on the unique facts of each case. As a general matter, however, the following principles illuminate the inquiry. First, the change of circumstances must involve either the child's circumstances or a parent's circumstances that affect the child's well-being. *Kendrick v. Shoemake,* 90 S.W.3d at 570. Second, the changed circumstances must have arisen after the entry of the custody order sought to be modified. *Turner v. Turner,* 776 S.W.2d 88, 90 (Tenn. Ct. App. 1989). Third, the changed circumstances must not have been reasonably anticipated when the underlying decree was entered. *Adelsperger v. Adelsperger,* 970 S.W.2d [482,] 485 [(Tenn. Ct. App. 1997)]. Fourth, the change in circumstances must affect the child's well-

18

being in some material way. *Kendrick v. Shoemake,* 90 S.W.3d at 570; *Blair v. Badenhope,* 77 S.W.3d [137,] 150 [(Tenn. 2002)]; *Hoalcraft v. Smithson,* 19 S.W.3d [822,] 829 [(Tenn. Ct. App. 1999)].

The person seeking to change an existing custody arrangement has the burden of demonstrating both that the child's circumstances have changed materially and that the best interests of the child require a change in the existing custody arrangement. *In re Bridges,* 63 S.W.3d 346, 348 (Tenn. Ct. App. 2001); *Musselman v. Acuff,* 826 S.W.2d 920, 922 (Tenn. Ct. App. 1991). The threshold question is whether there has been a material change in the child's circumstances. *Kendrick v. Shoemake,* 90 S.W.3d at 570; *Blair v. Badenhope,* 77 S.W.3d at 150; *Placencia v. Placencia,* 48 S.W.3d 732, 736 (Tenn. Ct. App. 2000). If the person seeking the change of custody cannot demonstrate that the child's circumstances have changed in some material way, the trial court should not re-examine the comparative fitness of the parents, *Caudill v. Foley,* 21 S.W.3d 203, 213 (Tenn. Ct. App. 1999), or engage in a "best interests of the child" analysis. Rather, in the absence of proof of a material change in the child's circumstances, the trial court should simply decline to change custody. *Hoalcraft v. Smithson,* 19 S.W.3d at 828.

*Oliver v. Oliver*, No. M2002-02880-COA-R3-CV, 2004 WL 892536, at *3 (Tenn. Ct. App. Apr. 26, 2004) (footnote omitted). When making a custody modification determination, a trial court is required to state "the reasons and the facts that constitute the basis for the custody determination." Tenn. Code Ann. § 36-6-101(a)(2)(B)(i); *see* Tenn. R. Civ. P. 52.01 ("In all actions tried upon the facts without a jury, the court shall find the facts specifically and shall state separately its conclusions of law and direct the entry of the appropriate judgment.").[5]

---

[5] In contrast, our Supreme Court has held the following regarding actions in which modification of a residential co-parenting schedule is at issue:

> We conclude that when the issue is modification of a residential parenting schedule, section 36-6-101(a)(2)(C) provides the governing standard for determining whether a material change in circumstances has occurred. We further conclude that section 36-6-101(a)(2)(C) abrogates any prior Tennessee decision, including *Blair, Kendrick,* and *Cranston,* which may be read as requiring a party requesting modification of a residential parenting schedule to prove that the alleged material change in circumstances could not reasonably have been anticipated when the initial residential parenting schedule was established.

*Armbrister*, 414 S.W.3d at 704; *see, e.g., Gentile v. Gentile*, No. M2014-01356-COA-R3-CV, 2015 WL 8482047, at *5 (Tenn. Ct. App. Dec. 9, 2015) (explaining that under the standard for a change in the residential co-parenting schedule, "unlike the standard for a change of primary residential parent, whether

This Court has previously recognized parental alienation as a development that may rise to the level of a material change in circumstance. *See Duke v. Duke,* No. M2013-00624-COA-R3-CV, 2014 WL 4966902, at \*18 (Tenn. Ct. App. Oct. 3, 2014) (concluding that "Father's interference with Mother's relationship with the children was a material change of circumstance" since entry of the prior permanent parenting plan in a case involving modification of a residential co-parenting schedule under allegations of and an expert witness's testimony describing parental alienation); *Costley v. Benjamin*, No. M2004-00375-COA-R3-CV, 2005 WL 1950114, at \*18-20 (Tenn. Ct. App. Aug. 12, 2005) (reversing the trial court's modification of custody from the mother to the father upon determining that the child's stated preference for the father stemmed in great part from "the kind of conduct by Father and his family aimed at, or likely to result in, alienating [the child] from Mother, including manipulating [the child's] emotions"); *Oliver*, 2004 WL 892536, at \*4 (determining that in a review of a petition to modify custody, the mother's conduct alienating the child from the father, "occurr[ing] after the entry of the order sought to be modified," constituted a material change in circumstance).

When a trial court finds that a material change in circumstance has occurred, the court is then required to apply the statutory "best interest" factors enumerated in Tennessee Code Annotated § 36-6-106(a) to determine whether a change in custody is in the best interest of the Children. *See Kendrick*, 90 S.W.3d at 570; *Cranston v. Combs*, 106 S.W.3d 641, 644 (Tenn. Ct. App. 2003). Tennessee Code Annotated § 36-6-106(a) provides:

> (a)  In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child, the determination shall be made on the basis of the best interest of the child. In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in this subsection (a), the location of the residences of the parents, the child's need for stability and all other relevant factors. The court shall consider all relevant factors, including the following, where applicable:

---

the change was reasonably anticipated when the prior residential parenting schedule order was entered is irrelevant") (citing *Armbrister*, 414 S.W.3d at 703).

(1)  The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

(2)  Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

(3)  Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4)  The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5)  The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6)  The love, affection, and emotional ties existing between each parent and the child;

(7)  The emotional needs and developmental level of the child;

(8)  The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of

21

confidential mental health information of a party under § 33-3-105(3). The court order required by § 33-3-105(3) must contain a qualified protective order that limits the dissemination of confidential protected mental health information to the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

Similarly, for "[a]ny final decree or decree of modification in an action for absolute divorce, legal separation, annulment, or separate maintenance involving a minor

22

child," Tennessee Code Annotated §36-6-404(a) (2014) provides that an appropriate permanent parenting plan shall:

(1)     Provide for the child's changing needs as the child grows and matures, in a way that minimizes the need for further modifications to the permanent parenting plan;

(2)     Establish the authority and responsibilities of each parent with respect to the child, consistent with the criteria in this part;

(3)     Minimize the child's exposure to harmful parental conflict;

(4)     Provide for a process for dispute resolution, before court action, unless precluded or limited by § 36-6-406; . . .

(5)     Allocate decision-making authority to one (1) or both parties regarding the child's education, health care, extracurricular activities, and religious upbringing. The parties may incorporate an agreement related to the care and growth of the child in these specified areas, or in other areas, into their plan, consistent with the criteria in this part. Regardless of the allocation of decision making in the parenting plan, the parties may agree that either parent may make emergency decisions affecting the health or safety of the child;

(6)     Provide that each parent may make the day-to-day decisions regarding the care of the child while the child is residing with that parent;

(7)     Provide that when mutual decision making is designated but cannot be achieved, the parties shall make a good-faith effort to resolve the issue through the appropriate dispute resolution process, subject to the exception set forth in subdivision (a)(4)(F);

(8)     Require the obligor to report annually on a date certain to the obligee, and the department of human services or its contractor in Title IV-D cases, on a form provided by the court, the obligor's income as defined by the child support guidelines and related provisions contained in chapter 5 of this title; and

(9)     Specify that if the driver license of a parent is currently expired, canceled, suspended or revoked or if the parent does not possess a

valid driver license for any other reason, the parent shall make acceptable transportation arrangements as may be necessary to protect and ensure the health, safety and welfare of the child when such child is in the custody of such parent.

Tennessee Code Annotated § 36-6-404(b) (2014) further provides:

(b)     Any permanent parenting plan shall include a residential schedule as defined in § 36-6-402. The court shall make residential provisions for each child, consistent with the child's developmental level and the family's social and economic circumstances, which encourage each parent to maintain a loving, stable, and nurturing relationship with the child. The child's residential schedule shall be consistent with this part. If the limitations of § 36-6-406 are not dispositive of the child's residential schedule, the court shall consider the factors found in § 36-6-106(a)(1)-(15).

In addition, Tennessee Code Annotated § 36-6-406(d), referenced in subsections -106(a)-(b) above for its potential limiting factors on co-parenting time, provides:

(d)     A parent's involvement or conduct may have an adverse effect on the child's best interest, and the court may preclude or limit any provisions of a parenting plan, if any of the following limiting factors are found to exist after a hearing:

(1)     A parent's neglect or substantial nonperformance of parenting responsibilities;

(2)     An emotional or physical impairment that interferes with the parent's performance of parenting responsibilities as defined in § 36-6-402;

(3)     An impairment resulting from drug, alcohol, or other substance abuse that interferes with the performance of parenting responsibilities;

(4)     The absence or substantial impairment of emotional ties between the parent and the child;

(5)     The abusive use of conflict by the parent that creates the danger of damage to the child's psychological development;

24

(6)     A parent has withheld from the other parent access to the child for a protracted period without good cause;

(7)     A parent's criminal convictions as they relate to such parent's ability to parent or to the welfare of the child; or

(8)     Such other factors or conduct as the court expressly finds adverse to the best interests of the child.

### A.  Material Change in Circumstance

The trial court made an express finding in its order granting custody to Mother that "[t]his case is a severe case of parental alienation against the Mother by the Father and the Paternal Grandmother."  However, as Father notes, the court did not make a finding that a material change in circumstance had occurred since entry of the 2015 PPP.  *See Oliver*, 2004 WL 892536, at *3 ("The threshold question is whether there has been a material change in the child's circumstances.").  In a decision involving a comparable lack of specific findings made by a trial court concerning a material change in circumstance with modification of the primary residential parent at issue, this Court explained:

> When confronted with insufficient findings of fact in a written order, appellate courts generally pursue one of two alternatives.  One alternative is to vacate the decision and remand so the trial court can make specific findings of fact.  *Lovlace v. Copley,* 418 S.W.3d 1, 36 (Tenn. 2013).  Another alternative is to conduct a "de novo review of the record to determine where the preponderance of the evidence lies."  *Id.*  The appropriate alternative depends on the particular circumstances of the case, including the adequacy of the record, the fact-intensive nature of the case, and whether witness credibility determinations must be made.  *See id.* (declining to conduct a de novo review because credibility determinations were necessary to resolve factual disputes).

*Skowronski v. Wade*, No. M2014-01501-COA-R3-CV, 2015 WL 6509296, at *6 (Tenn. Ct. App. Oct. 27, 2015) (determining that a *de novo* review of the record was appropriate because the record was adequate and the trial court had "addressed the facts relied upon by Father in his request for a change in primary residential parent in conjunction with its analysis of the child's best interest."); *see, e.g., Williamson v. Lamm*, No. M2015-02006-COA-R3-CV, 2016 WL 5723953, at *4 (Tenn. Ct. App. Sept. 30, 2016) ("In the absence of a finding of a material change by the trial court, we review the record de novo to

determine where the preponderance of the evidence lies."); *Blakes v. Sims*, No. W2007-02129-COA-R3-CV, 2008 WL 5130425, at *3 (Tenn. Ct. App. Dec. 5, 2008) (conducting an "'independent review of the record to determine where the preponderance of the evidence lies'" when "the trial court made no express finding regarding the threshold determination of whether a material change in circumstance had occurred such that a modification of custody was warranted") (quoting *Cosner v. Cosner*, No. E2007-02031-COA-R3-CV, 2008 WL 3892024, at *3 (Tenn. Ct. App. Aug. 22, 2008)); *cf. Connors v. Lawson*, No. E2010-00791-COA-R3-CV, 2010 WL 4953496, at *4 (Tenn. Ct. App. Dec. 6, 2010) (vacating the trial court's denial of the father's petition to modify the designation of primary residential parent because "the Trial Court did not reference in its final judgment whether Father had established what was necessary to change custody and designate him as primary residential parent").

Under the specific circumstances of the case before us, we determine the record to be adequate for *de novo* review of whether a material change in circumstance warranting modification in the designation of primary residential parent had occurred. Moreover, as in *Skowronski*, the trial court in this action addressed the facts relied upon by Mother in her request for a change in primary residential parent in conjunction with the court's analysis of the Children's best interest. *See Skowronski*, 2015 WL 6509296, at *6. The trial court also made relevant determinations of witness credibility to which this Court defers, in particular, the court's express finding that Dr. Schacht's expert witness testimony was highly credible. *See Lovlace v. Copley*, 418 S.W.3d 1, 36 (Tenn. 2013) (explaining that *de novo* review of the contempt issues presented was not feasible when the trial court had failed to make factual findings regarding disputed facts given that "appellate courts are ill-equipped to make the type of credibility determinations that would be necessary to resolve the factual disputes").

At the time that Mother commenced the instant action, the agreed 2015 PPP, entered by the trial court on June 30, 2015, was the permanent parenting plan order in effect and remained the most recent permanent parenting plan order during trial in October 2015 and June 2016. Mother filed her "Emergency Motion for Custody, to Modify the Parenting Plan, for Criminal and Civil Contempt, for Alternative Relief and for Additional Relief" on October 2, 2015.[6] Pursuant to the 2015 PPP, Father had been

---

[6] We note that pursuant to Tennessee Code Annotated § 36-6-101(a)(2)(B)-(C), the proper form of pleading to commence an action for modification of a permanent parenting plan order is a petition with leading process, rather than a motion. Inasmuch as no issues have been raised in this case regarding proper service and notice specific to the custody action, we determine that Father has waived any issues regarding the form of Mother's initiating action for modification of the primary residential parent designation. *See, e.g., Eberbach v. Eberbach*, ___ S.W.3d ___, ___ n.2, No. M2014-01811-SC-R11-CV, 2017 WL 2255582, at *1 n.2 (Tenn. May 23, 2017) (analyzing the appeal on the merits when neither party had raised an issue as to proper notice and service while noting that "although a final judgment had

designated the primary residential parent with sole major decision-making authority, and Mother was to enjoy 85 days of annual residential co-parenting time with the Children, with much of Mother's co-parenting time to take place at Mother's Texas residence during the Children's summer vacation and other holidays.

Mother's October 2, 2015 motion brought to the trial court's attention the fact that B.M. had been admitted to Kingwood for psychiatric treatment during Mother's co-parenting time in the summer of 2015. Among the exhibits attached to Mother's motion were the text message conversations Mother had discovered on B.M.'s cellular telephone between B.M. and Father. As the trial court noted in its memorandum opinion incorporated into the 2016 PPP, portions of the messages sent to B.M. from Father appear to be aimed at supporting B.M.'s time with Mother, advising him to calm down and accept the co-parenting time with Mother. Other messages, however, evince the parental alienation against Mother eventually found by the trial court. For example:

B.M.:     I am going to make [Mother] hurt but not enough to really get her.

Father:     [Mother] doesn't mind to cause pain for others. You can't win this battle with her.

* * *

B.M.:     [Maternal Grandfather] is the reason [Mother] is the way she is.

Father:     Yes. Keep in mind. They can't help the way they were born and created by God.

They both are mentally ill.

The bible tells us clearly that mental illness is a spiritual problem. It is not physical. Doctors treat mental illness like it is a physical problem.

* * *

Father:     You have a right to be ugly to [Mother]. But not to [Maternal Grandmother].

been entered in the divorce action, these initial pleadings in the instant action were filed as 'motions' in the trial court as opposed to petitions with leading process.").

27

     \* \* \*

B.M.:          I already told [Mother] that if she dies it isn't even worth me going to her [funeral].

                 How can I relax when [Mother] is taking me away from everything to this crap hole.

Father:       [C.M.] has done well with tuning out [Mother] and doing stuff that keeps his mind off the situation. This is what you should do to relax.

B.M.:          Well if I do I will be back here again.

Father:       You have to go back because the law forces you to go. You had better make the best of it. You can't change the situation so accept it and move on.

                 This too will end in a year and 22 days.

B.M.           [Mother] doesn't follow that law and if I stay any longer I will end up liking her I must stay away from her.

Father:       You will never like her. Nobody likes her. It is impossible.

Mother also attached to her October 2, 2015 motion records from Mr. Scott and Kingwood's discharge summary plan for B.M., both filed under seal. Mr. Scott's report summarizing his counseling sessions with the Children before and during Mother's summer 2015 co-parenting time indicates that B.M.'s hospitalization at Kingwood was prompted by Mr. Scott's concern after meeting with B.M. via FaceTime on July 10, 2015. According to Mr. Scott's report, [B.M.] "was observed to be very angry and upset with [Mother] for having to be in TX" and was "calling her names and using profanity." Mr. Scott reported that B.M. "verbalized suicidal and homicidal ideation" and "was not able to contract for safety." When Mr. Scott conferred with the parents following this session, the parents agreed that emergency services should be called. Mr. Scott's testimony at trial corroborated his report. Kingwood records demonstrate that B.M. was treated at the hospital for approximately two weeks with both parents cooperating in his treatment. B.M. was then released into Father's care at about the time his co-parenting time with Mother initially had been scheduled to end.

During a tumultuous month in October 2015, the trial court was presented with competing emergency motions from the parents concerning temporary custody of C.M., who under the court's October 5, 2015 ruling (entered as an order on October 9, 2015) was in Mother's care in Texas during the fall break from school when the court granted Mother's emergency motion on October 9, 2015 (entered as an order on October 16, 2015) to prohibit C.M. from returning to Father's residence. In the order entered October 9, 2015, the court also appointed Dr. Schacht to conduct psychiatric evaluations and submit a report. In the interim between the court's ruling on October 9, 2015, and entry of the court's order memorializing the ruling on October 16, 2015, C.M. was admitted to Kingwood for psychiatric treatment while in Mother's care on October 14, 2015. Following a telephone conversation with C.M., Ms. Mahoney had contacted local authorities when she became concerned about C.M.'s welfare due to verbalization of thoughts of self-harm. Father then filed an emergency motion on October 23, 2015, to vacate or set aside the temporary order in which the court had granted custody of C.M. to Mother.

The trial court, with Chancellor Rambo presiding in the trial court judge's absence, heard Father's motion, entering an order the same day and directing that C.M. was to be discharged when ready by Kingwood to Mother's care if prior to 7:00 a.m. on October 26, 2015, and to Father's care if after that time. The October 23, 2015 order further provided that the parties and the Children were to appear before the trial court judge on October 27, 2015, which they did. Mother filed another emergency motion at the beginning of trial on October 27, 2015, again requesting that she be designated the primary residential parent for the Children and also requesting, *inter alia*, that Father's co-parenting time be "supervised and substantially restricted."

At the close of two days of trial on October 28, 2015, the trial court did not expressly address whether a material change in circumstance affecting the Children had occurred since entry of the 2015 PPP. In a memorandum opinion issued at the close of the October 2015 proceedings, the court took the matter under advisement pending receipt of Dr. Schacht's report and addressed the immediate issue of where B.M. and C.M. should reside pending Dr. Schacht's report and further proceedings. Expressing concern for the Children's safety amid their respective threats of self-harm if required to reside with Mother in Texas, the court directed that the Children would reside with Father in Tennessee pending further action. In a written order entered June 27, 2016, memorializing the trial court's October 28, 2015 ruling, the court stated in pertinent part:

It is . . .

ORDERED that [B.M.] shall remain with his father who shall be the primary parent with all decision making responsibilities. The Court does

not order any set parenting time with [B.M.] for the mother. The facts upon which this is based are clear from the attached transcript. It is further

ORDERED that [C.M.] will remain in the temporary physical custody of his father who shall temporarily be designated the primary parent. Mother shall also have zero days with [C.M.] at this point. Either boy shall be permitted to speak with or visit with his mother as desired by the child. This is not a final decision on the permanent parenting plan for [C.M.] and the Court remains completely open to the various possibilities previously suggested regarding parenting time for him, his mother and his father.

(Emphasis in original.)

To summarize, at the time of the June 2016 two-day trial, held subsequent to the trial court's receipt of Dr. Schacht's report, the Children had been residing exclusively with Father since October 2015 under the most recent temporary order. However, the 2015 PPP, which was a final order at the time it was entered, was the most recent order at issue in the action for modification. *See In re E.J.M.*, No. W2003-02603-COA-R3-JV, 2005 WL 562754, at *18 (Tenn. Ct. App. Mar. 10, 2005) ("When a petition for modification is filed, any temporary decree changing custody pending final resolution is just that—temporary and not entitled to the same *res judicata* protections [as a final order]."); *see also Jones v. Jones*, No. M2014-00921-COA-R3-CV, 2016 WL 7786450, at *7 (Tenn. Ct. App. Mar. 18, 2016). Under the 2015 PPP, Father was the primary residential parent, and Mother was entitled to 85 days of annual co-parenting time with the Children. As to Mother's motion to modify the 2015 PPP, the threshold issue to be decided was therefore whether a material change in circumstance affecting the Children had occurred since entry of the 2015 PPP in June 2015. *See Kendrick,* 90 S.W.3d at 570.

Following the two days of trial in June 2016 and with Dr. Schacht's report and testimony before it, the trial court entered its order granting custody to Mother on July 18, 2016, stating in relevant part:

Based on the allegations and issues raised in the pleadings, the total of four days of testimony, exhibits introduced into evidence, statements and argument of counsel and the case file as a whole, this Honorable Court **FINDS, CONCLUDES AND ORDERS** as follows:

This case is a severe case of parental alienation against the Mother by the Father and the Paternal Grandmother.

Custody of the parties' two minor children is hereby immediately modified and vested with [Mother], who shall move both children with her to the Mother's home in Texas.

Pursuant to Dr. Thomas Schacht's 41 page report to this Court, Mother shall have the option of taking herself and one or both boys through the full 4-day Family Bridges Workshop ("FBW"), and/or engaging the services of Dr. Joann Murphey (Texas), a certified FBW leader, to develop a treatment plan for one or both of the minor boys in which FBW methodology is utilized. This Court hereby additionally orders, with respect to the Family Bridges Workshop, without limitation, the restrictions on Father's parenting time . . . .

(Paragraph numbering omitted.) During trial, Mother had presented an affidavit executed by Dr. Joann Murphey, referenced in the court's order, indicating that Dr. Murphey had consulted with Mother prior to trial and agreed to develop a treatment plan for the Children through Family Bridges if the court were to grant Mother "primary custody." Attached to Dr. Murphey's affidavit were a description of Family Bridges and a document entitled, "Provisions of Court Orders in Cases Where Family Bridges is Appropriate." The trial court's order granting custody to Mother delineated specific provisions to facilitate the Children's participation in Family Bridges, adapted from those listed by Family Bridges in this document. Particularly at issue on appeal, the provisions ordered by the trial court included prohibiting Father and Father's family from contact with the Children for at least ninety days, with such contact to resume solely upon the recommendation of an after-care professional with whom Father was directed to cooperate.

In the order granting custody to Mother, the trial court incorporated its memorandum opinion, transcribed from the close of trial on June 29, 2016, stating in pertinent part:

It's a pretty straight-forward case in terms of what these parties want. [Father] would like for everything to remain the same. [Mother] would like for everything to change. And this is just about – if it's not the, it's just about the, single most disturbing case I have ever seen or heard in my entire legal career. That includes being a judge and an attorney.

All right, this Court has heard from Dr. Thomas Schacht. We have seen his CV [curriculum vitae] as well as his 41-page report. The Court does note that both parties were given the opportunity to provide to him any documentation or information that they wanted him to see or consider or

review. The Court finds that the parties did have ample time and opportunity to do that. And the information provided to Dr. Schacht, and upon which his determinations were based, [is] fully sufficient. I do not think he was missing any vital information.

Dr. Schacht testified that he focused on the alleged alienation of these children and the mental health concerns of these children. He found that these boys are alienated. He made the determination that he did not feel that they are simply estranged, but that this is indeed a parental-alienation case.

Dr. Schacht testified that this is supported by the actions and statements of the father and of the paternal grandmother. Dr. Schacht noted a history of emotional and behavioral issues with the children . . . .

He also discussed how the ongoing litigation in this case has affected their ability to benefit from mental-health treatment and he addressed the fact that there are some issues of self-harm with these children, if nothing else, simply because of the history of bipolarism in the family. And that is something that the Court has to and has considered. He strongly recommended that their access to weapons be restricted, which the Court understands and agrees with. Dr. Schacht testified that [Mother] needs to continue in psychiatric care to be followed for her bipolar disorder. [Mother] fully agrees with that, has no problem with that, and has done that.

It was Dr. Schacht's opinion that these children's rejection of their mother was without justification. He said that, regardless of how their feelings about their mother originated, they have been supported by father, grandmother, and unfortunately by Ms. Mahoney; and the Court does agree with that.

* * *

All right. Dr. Schacht reported that the Court cannot manage the mental-health care of the boys. I guess he was calling me out a little bit, which he probably needed to do. And this Court agrees. My job is to place these kids with the parent who is best suited to care for them, not to try to make mental-health determinations, but the Court does very carefully consider all of the mental-health components in this case and what the ramifications of each of the Court's actions might be.

32

Dr. Schacht has four options, basically broken down into a couple of categories, as to what this Court might choose to do in this case. The basic decision is leave them with dad and see what happens. Move them with [Mother] in one of two different ways, four very, very different scenarios. We talked about Option No. 1, which is nothing is done, simply the boys stay with their father, I think Dr. Schacht phrased it as, "acquiesce to the boys' demands, endorse the status quo and accept the situation as is, with full custody to [Father], no scheduled contacts with [Mother] and no other court-ordered intervention."

And, you know, it's kind of interesting because that's kind of what this Court did back in October. . . .

And what was the result? The result was, they had no contact with their mother. She didn't know anything that was happening, nobody bothered to call, she didn't find out about any surgeries, she didn't get any pictures. I find it extremely disturbing that the father would sit up here and tell [Mother], "You're not even going to recognize your youngest son. He's grown so much you won't even recognize him."

So that's what happens if I leave the status quo as it is. I think we can safely say, that is not going to happen.

Option 2 is leave primary custody with [Father] and order renewed efforts to remedy alienation, be it education, counseling, and parenting coordination. Here's my problem with that one: That's what we've been doing for nigh on 16 years. We've been working on this and working on it and we've been to counselors and therapists and doctors and court and more counselors and different therapists and more doctors and court. It is a merry-go-round upon which we have all been for many, many years and it did not work. I have no reason to believe it's ever going to work in the future.

I want to, before I go through the last two options, I want to talk a little bit more about Dr. Schacht's testimony. He testified that he probed these boys very carefully for the basis of the extreme rejection of their mother. He found, and I agree, that it's not based on their personal experiences; it's based on wild inferences and very global responses without any specificity that this Court has been able to find; and, remember,

33

I've been hearing this for a long time and that has been very consistent in this case.

Indications of the parental and grandparental influence on these boys has been made available on previous hearings to this Court. This Court very clearly remembers the text messages and the things that were said between father and son and between grandmother. . . .

Dr. Schacht testified, and the Court agrees, that father is aware that the boys reject their mother, but he doesn't have any thought of not validating it.

Something else that really disturbs me is the fact of how everybody on your side of the family, [Father], is treating the fact that [Mother] is bipolar. I see zero empathy from anybody with her over what that might entail for her. And not just the empathy issue; it's really a matter of intolerance. It's almost as bad as calling somebody a racial name.

I mean, the repeated references to her mental-health issues and her problems, "she can't do anything and she can't cope and she can't this and she can't that," it's all very disturbing, especially when I look at somebody who has recognized the problem, has been to the doctor, is on medication, is a pharmacist, has her own home, a full-time job, and her own company. She's done pretty well for herself. So I think that belittling her for that mental-health issue, especially when that same diagnosis may at some time or in some way affect these boys, I just think it's very harmful. I find it very, I found it very, disturbing.

Dr. Schacht did comment and we've heard this a couple of times about [Mother] medicating homeopathic remedies, maybe giving the kids things that the doctors didn't say to give them. And, in the future, that has to stop. Parents, especially in cases like this, these boys' medications are pretty fragilely balanced, it would be my estimation. And I don't think the parents should be interfering with any additional remedies or medicines.

All right. Then Dr. Schacht went on to talk about the Options 3 and 4. Option 3 was: Disrupt the current alienating dynamic by placing the boys in a neutral setting apart from both parents. And No. 4 was to place one or both boys with [Mother] with temporary suspension of all contact between [Father], his extended family, and the boys, suspension of all decision-making authority by [Father], and future graduated resumption of

contact with [Father] and his extended family contingent upon the boys' progress in relationship with their mother and upon their behavior, meeting and maintaining specified conditions. And that, of course, led us to our discussion about the Family Bridges Program.

I guess Dr. Schacht kind of boiled it down in simple terms: Resum[ing] contact with father under that option would be tied to the quality and progress of the repair in the relationship of the boys with their mother. In other words, instead of rewarding the boys in some way for rejecting their mother, they would be rewarded for accepting their mother by being able to be with their dad.

Following its review of the options presented by Dr. Schacht as possible avenues to move forward given the finding of parental alienation, the trial court proceeded to consider the best interest factors provided in Tennessee Code Annotated § 36-6-106(a). The court found in relevant part:

Dr. Schacht looked at some of the statutory factors that the Court would be required to consider in making any kind of change of parenting plan. For instance, were the kids closer to their father, were they more bonded with their father? And he said he really couldn't answer that because everything is so distorted by the alienation.

And, as I go through my statutory factors, which I did and which we can do, you find that that does distort the consideration on so many of them. I'm talking about TCA 36-6-106 where the Court is directed on how to make a decision based on the best interest of the children. That statute says that the Court "shall consider all relevant factors including the following." The first one of course is the strength, nature, and stability of the child's relationship with each parent. The relationships here are so skewed because of the alienation it's virtually impossible to make an objective assessment of that.

No. 2 is "each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent/child relationship between the child and both of the child's parents consistent with the best interest of the child."

Here I have a case in which probably one of the best forensic psychologist-type experts I've ever seen or heard has found a case of

35

parental alienation. So there's no doubt that the parent who is willing to facilitate, encourage is not the father in this case. And from the testimony I heard from the mother the Court firmly believes that that would be [Mother].

Both parties have provided the necessities. Either one of you [parents] are perfectly able to give these kids food, clothing, shelter, make sure they get up in the morning, make sure they go to school, make sure they don't flunk out, make sure they get to the doctor. You [parents] are just even on that; either one of you are perfectly capable of doing that.

The other things like emotional needs in a relationship with siblings, that kind of thing once again is so skewed because of the parental alienation issues and just the spewing-hatred that these kids have shown for [Mother], I just don't even know how to consider those.

The Court does find and does believe that parental alienation is a form of emotional abuse that should not be tolerated. The Court would be glad to consider the reasonable preference of these children if I could find that those statements by them were reasonable, which the Court cannot and does not. Fortunately, we have a situation where I have two parents who, you know, are employed, they're able to make some money, we have some financial resources to do some things with because that is going to become very necessary.

I will also comment on one of the statutory factors as to the relationship between the siblings. I found it very interesting that Dr. Schacht indicated the relationship of these two boys, while it appears to be very close, he says it's not healthy, what they draw from each other; and I think there is a solid basis for that statement.

Dr. Schacht testified that the most stable thing in the father's home is actually the conflict. He recognized, as have I, that the father's home has been stable as far as having a bed to sleep in, food to eat, that kind of thing,

Faith Mahoney testified she has been counseling with the children since October of last year, brought into the case because dad wanted the boys to, quote, "have a voice in court." The boys very clearly told her, as they have me, that they don't want to go with their mother. She felt that [Father] was always supportive and there for the children and her job was to support whatever the kids wanted. She had no concern why they hated

36

their mother. And she would work with the children in the moment. Dr. Schacht recognized that as a valid philosophy for counseling under normal circumstances, which obviously are not what we have here.

All right. The Court did hear from both parties, first from [Mother], who tells us she does live in Texas, she does have employment there, she has her own business there, she has a home there, she has family there. In discussing whether or not [Father] is in contempt of court, she testified she was not made aware of certain awards the children received in school, was not made aware of [C.M.'s] emergency surgery in February, which was finally disclosed in May, that she had been blocked on the boys' phones. She has not heard from them since last October.

It is her desire to go with and/or send the kids to this Family Bridges Program and she asked the Court to have the father pay for that program. It's my understanding she would like to go ahead and take [C.M.] with her and perhaps begin a modified workshop plan with Dr. Murphey. She would like for [B.M.] to go straight into a full program with Bridges if that is possible.

It is interesting to the Court, and significant to the Court, that [Mother] testified that actually [Father] is, quote, "good to the boys," that he can be a good, loving, and supportive father; he simply cannot do that when it comes to [Mother] and he cannot support her in her role as a mother.

* * *

The Court did hear [B.M.] testify. Dr. Schacht did comment that I got to see a little bit of what he saw in his office. I'm sure Dr. Schacht doesn't realize I've been there, done that; I've seen it before. He started out a little bit better. I thought he was going to hold it together pretty good, but about 30 seconds of cross-examination and the vitriolic [B.M.] came out. It's very disturbing to watch.

I will say to [Father]: You've done a great job of getting these kids to excel at school. Their grades are good, their honors are good. I mean, they're really doing well in school.

* * *

37

When asked if he left Tennessee what would he miss? [B.M.] said he would miss my loving father and immediately, like boom, immediately he says, "and not her, not her, not her who is me, me, me, she's always me." And it was like pow, he went straight from level, rational, organized, responsive, to hate, hate, hate, negative, negative, negative. It is very disturbing to watch. And then he goes in, "Oh, and I'll also miss my brother and my pets."

His first answer to why he didn't want to go to Texas was that [his Tennessee high school] was a better school as far as a physical plant. It was a nicer building; it wasn't a big, metal, creepy building and they had great, I guess, activity/outdoor areas, which is – I have no idea where that came from. But that was, on his direct testimony that was, why he said he wanted to stay in Tennessee.

[B.M.] testified, "Dad has always advocated building a relationship with Mom," but then he went on to say the proper way in which to do that would be in small steps like meeting me out in Tennessee. Everything has to occur in Tennessee, with no schedule, with no order, and it has to be done exactly like dad wants it to be done.

His generalities that [B.M.] states as he goes through his testimony are just outrageous. He says everything is "horribly catastrophic" whenever it comes to his mother. Horribly catastrophic, everything is catastrophic. I think he, I think [B.M.], unfortunately has a real problem with empathy. He never could tell me how [Mother] would feel about not getting to see him or about not getting letters or info or whatever from him. He simply was not able to ever answer that question. . . . He stated his mother, quote, "screws up no matter what."

All right. The Court heard from [Father] and I'll agree with him on some things he said, too. He recognizes this case has been going on for 16 years; it's been going on forever. He has been to counseling, they've been to doctors. Some of that the parties have cooperated with, some of it they haven't. He agrees it's hard for the boys to be intimate.

So I think he has some real recognition of the problems that his children have, but his testimony and his responses to anything about [Mother] are very, very, very much like [B.M.'s]: It's always her fault. It's always her fault. He has always done it right, she never has, and if he

wasn't in there managing things, it wasn't ever going to work. And so far it hasn't.

[Father] testifies, "I have always been kind and considerate and forgiving of [Mother]," quote, "and her mental illness." It's nice to be forgiven for your mental illness, isn't it? He takes credit for initiating the mediation processes. He takes credit for initiating any parenting time between the boys and [Mother] that did take place. After the couple of good visits in . . . [2015]. [Father] thought things were going pretty good and then it kind of fell apart and, he says, "Oh, no. I thought I had it working."

Some of [Father's] statements are kind of bizarre to me. I just – I wonder if they're really in touch with reality. As a 22-month-old, he says that, [B.M.] left with [Mother] to go to Texas; he was speaking perfectly with no issues and when he came back he had a speech impairment. I had never heard that one in this history and I don't think I've ever seen that in any of the medical history. I guess it could be true, but of course, [Mother] testifies that that absolutely did not happen. I find it a little far-fetched.

Going on with the theme of "I do everything right and she does everything wrong," [Father] testified he kept all the appointments ever made for the boys, she didn't and wouldn't. She never, quote, "never kept appointments[."] He testified there was almost a daily conflict with [Mother] and the school and he was the one who had to bail everybody out; if he didn't fix it, it didn't get fixed. And I noticed a term he likes to use is "Dad has to manage the situations."

* * *

[Father] testified absolutely, 1000 percent, custody with [Mother], it won't work, it'll never work, it ain't going to work, Bridges won't work, it's never going to work under any circumstances, none of it's going to work. "The only thing that's going to work is for everybody to stay here in Tennessee, do what I tell them to do, have parenting time whenever the boys want to have it, if they want to have it, and slowly build a relationship." And that also bears no resemblance to reality. That's never going to work.

I think it's kind of sad the way [Father] kind of convinced [C.M.] to being a victim. For instance, [Father] testified that, with [B.M.] aging out,

39

[C.M.], quote, "wouldn't be able to handle himself with his mother." [Father] told the Court he feels he has gone above and beyond anything that would be required of a normal human being in terms of facilitating a relationship between [Mother] and the boys. I do not believe that. . . .

I find it interesting [Father] stated, "The only time [B.M.] was safe last year when he was in Texas was when he was at the psychiatric hospital, was the only time he was safe, but there are no concrete reports, there's no details, there's no evidence that there was – that that should be true at all. . . . [Father] told at least several people mother's rights had been terminated; that is not what happened.

* * *

So the Court has Options 3 and 4. The Court has decided that the only appropriate option in this case is No. 4. This Court is immediately going to make the mother the primary parent, with all decision-making responsibility for both of these children. It is her option to use the Bridges Program or a modified Family Bridges Treatment Plan. A lot of it depends on what these parties can afford.

Do I know I'm disrupting [B.M.'s] life? Sure I do, I absolutely do. Do I know I'm disrupting [C.M.'s] life? I absolutely do, I understand that. Am I taking just a big old leap here that something good is going to come out of this? Yes, I am, I sure as heck am. But you know what? This is the last chance for [Mother] and two boys to have a relationship that no child should ever be deprived of.

Upon our thorough review of the record, including the four days of testimony heard by the trial court in October 2015 and June 2016, Dr. Schacht's report, and several volumes of exhibits presented at trial, we determine that the evidence does not preponderate against the trial court's finding that the Children had been severely alienated against Mother with that alienation supported by Father. While the trial court found Dr. Schacht's testimony to be highly credible, it found Father's testimony to be often characterized by extreme negative generalizations regarding Mother without reasonable bases in fact. The Children's respective testimonies, particularly B.M.'s testimony during the June 2016 trial, mirrored many of these negative generalizations concerning Mother. Father stated his belief that he had attempted to support the relationship between Mother and the Children, but simultaneously, his testimony demonstrated his opinion that Mother could not manage her own behavior or relationships. However, as the trial court noted, the evidence demonstrated that Mother

had undergone treatment for and managed her bipolar disorder and was an accomplished, educated professional with a secure living situation.

Although the trial court credited and adopted Dr. Schacht's expert opinion that parental alienation had occurred in this case, the court did not make factual findings specific to when the parental alienation developed in relation to the 2015 PPP. Dr. Schacht did not address specifically in his testimony whether the parental alienation he found in his evaluation had been a new development since entry of the 2015 PPP. He did, however, state in his report, that the "concerted refusal by [B.M.] and [C.M.] to participate in the scheduled visitation with their mother. . . . reached crisis proportions in the summer and fall of 2015 . . . ." (emphasis added).

In her March 2015 pleading that ultimately led to entry of the 2015 PPP, Mother alleged that Father had in 2014 and early 2015 refused to allow her the co-parenting time with the Children provided in the 2009 PPP then in effect. Mother further alleged in her March 2015 motion that Father had "alienat[ed] the children away from her . . . ." Mother's allegations demonstrate that prior to entry of the 2015 PPP, she was aware of the Children's alienation from her as a condition supported by Father. She testified, however, that when entering into the mediated agreement that became the 2015 PPP, she did not anticipate the events that had occurred since then and had been "hopeful" that "everything had been resolved." When questioned directly regarding whether circumstances had changed in the family since June 30, 2015, Mother responded: "Tremendously."

We determine that a material change in circumstance affecting the Children had occurred by the time that Mother filed her action for modification of custody on October 2, 2015. As Dr. Schacht noted, the alienation of the Children from Mother had reached "crisis proportions" by this time. Moreover, B.M. had been admitted to a psychiatric hospital, was enormously angry with Mother for her insistence on exercising her co-parenting time with him, and was feared to be a danger to himself and perhaps Mother. Specific to B.M., the exacerbation of parental alienation and his psychiatric hospitalization constituted a change in circumstances since entry of the 2015 PPP that (1) involved B.M., (2) had arisen after entry of the 2015 PPP, (3) was not reasonably anticipated when the 2015 PPP was entered, and (4) affected B.M.'s well-being. *See Oliver*, 2004 WL 892536, at *3.

As to C.M., the situation, even as it existed when Mother filed her action in early October 2015, involved him also in that his co-parenting time with Mother was punctuated by his brother's hospitalization. By the time that the trial court conducted the first two days of trial in late October 2015, C.M. had himself been hospitalized at

Kingwood and had echoed some of B.M.'s extreme preference for residing with Father one-hundred percent of the time.

Although the trial court erred by failing to expressly state that a material change in circumstance had occurred since entry of the 2015 PPP, we conclude that this error was harmless. Upon such a material change of circumstance as existed in this case, the trial court did not err by proceeding to an analysis of whether a custody modification was in the best interest of the Children.

## B. Best Interest of the Children

Father argues that the trial court erred by failing to properly weigh the statutory best interest factors contained in Tennessee Code Annotated § 36-6-106(a). We note that the trial court did set forth a step-by-step, detailed analysis of the statutory best interest factors. Father asserts that the court improperly adopted wholesale Dr. Schacht's opinion concerning parental alienation and failed to consider Father's years as the primary caregiver of the Children (factor 5) in its analysis of the best interest factors. *See* Tenn. Code Ann. § 36-6-106(a). Father also asserts that because the court found several factors to be "skewed" by parental alienation, such as the love and emotional ties existing between each parent and the child (factor 6), the Children's relationships with each other and extended family members (factor 9), and the Children's expressed preference for residing with Father (factor 13), the court erred by discounting these factors. *See id.*. Father further asserts that in highly crediting Dr. Schacht's analysis of parental alienation, the court ignored the emotional needs and developmental levels of the Children (factor 7) and the moral, physical, mental, and emotional fitness of each parent (factor 8). *See id.* Upon careful review, we disagree.

The trial court's findings clarify that in modifying the designation of primary residential parent, directing Mother and the Children to participate in Family Bridges, and eliminating Father's co-parenting time and contact with the Children pending post-workshop professional recommendation, the court was attempting to provide a "last chance for [Mother] and [the Children] to have a relationship" and also to alleviate potential long-term harmful effects of parental alienation on the Children. Regarding such effects, Dr. Schacht testified:

[T]he most straightforward way to understand the harm from parental alienation is against the backdrop of the normal developmental support that parents provide in a healthy family. In a healthy parent/child relationship, parents provide by example and by instruction assistance in children's emotional development and their development of the capacity to relate to others in development of a moral sensibility, in the development of capacity

42

for empathy, to appreciate another person's state of mind and emotional experience.

Parental alienation at one level or another undermines each of those developmental pathways so that when a child is alienated and that alienation is supported by the other parent, the parent who is supporting the alienation, whether this is their intent or not, is effectively supporting the child in cruel, unempathic behavior towards another human being, they are supporting the child in attitudes and behaviors towards interpersonal conflict that emphasize rejection, separation, and polarization, rather than resolution.

Often, in dealing with the professed basis for the alienation, the child is being supported in oversimplified, polarized, black-and-white thinking, which undermines critical-thinking skills and so forth so that ultimately parental alienation is a risk to normal personality development because of those kinds of effects. To the extent that we have research on long-term outcomes of people who report having experienced parental alienation, there is certainly a basis for concern that these kinds of adverse effects can persist long-term and can have adverse effects on adult capacity for intimate relationships and on adult capacity for emotional self-regulation.

*See generally Varley v. Varley*, 934 S.W.2d 659, 667 (Tenn. Ct. App. 1996), *perm. app. denied* (Tenn. Oct. 28, 1996) ("When loved by both parents, children should be taught to love and respect each parent equally. This reciprocation, in turn, will garner self respect and a positive self image in the children.").

We determine that with such a focus, the trial court was, contrary to Father's argument, definitely considering the emotional needs and developmental levels of the Children (factor 7). *See* Tenn. Code Ann. § 36-6-106(a). In addition, the court had appointed a forensic psychologist to obtain insight into the reasons for the Children's psychiatric hospitalizations and, in light of Dr. Schacht's assessments, the mental and emotional fitness of each parent (factor 8). *See id.* The court closely considered the Children's respective relationships with each parent, including the history in this case of Father as the primary residential parent and primary caregiver with close emotional ties to the Children (factors 1, 5, and 6). *See id.* In crediting Dr. Schacht's expert opinion concerning parental alienation, the court gave great weight to "[e]ach parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of

43

the child's parents" (factor 2), finding that this factor weighed heavily in favor of Mother. *See id.* (emphasis added).

The trial court also found that the parents were equal in their ability to provide necessities for the Children (factor 4). *See id.* Although Father argues that the trial court ignored Mother's earlier history of alleged instability in relocating away from Tennessee, holding several different jobs, and accruing some child support arrearage, the record indicates that the court simply found such history from many years prior to entry of the 2015 PPP to be irrelevant. Unrefuted testimony demonstrated that Mother's current employment and living situations were stable. We note also that both Mother and Father participated in therapy during B.M.'s and C.M.'s respective psychiatric hospitalizations and that neither one balked at obtaining professional assistance in an emergency.

Father takes great issue with the trial court's adoption of Dr. Schacht's opinion that the stability in Father's home was one of conflict. During cross-examination of Dr. Schacht, the following exchange occurred in relevant part:

| | |
|---|---|
| Father's Counsel: | What about [the Children's] stability in the father's home, as compared to their mother's home? The last two times they were in their mother's home they ended up in a mental hospital. So they are, by definition, more stable in their father's home environment, correct? |
| Dr. Schacht: | I think the question of stability has to again be looked at in context. The most stable thing that I was able to discern in their father's home is the stability of conflict. |
| * * * | |
| Father's Counsel: | But as of currently they are more stable in their father's home environment, correct? |
| Dr. Schacht: | More stable than what? |
| Father's Counsel: | More stable than they were in their mother's home most recently. |

44

Dr. Schacht:        If you define what they did to get out of their mother's home as relevant to the concept of stability, then the answer is yes.

Father essentially argues that the trial court ignored the context of the above exchange to adopt the finding that "the most stable thing in the father's home [was] actually the conflict." To the contrary, we interpret Dr. Schacht's testimony in this regard, as did the trial court, to mean that Father had engendered an environment in the home that was most "stable" in its united conflict against Mother.

As to the Children's stated preference to reside exclusively with Father, the "skewed" nature of this preference, as expressed in this case, is at the heart of the finding of severe parental alienation. Rather than failing to consider the Children's preference, the trial court's findings demonstrate that it listened closely to B.M.'s and C.M.'s respective testimonies but found that their stated preference was not "reasonable," particularly in B.M.'s case, in light of the "vitriolic" statements he made against Mother without a reasonable basis in fact. *See* Tenn. Code Ann. § 36-6-106(a)(13) (providing for consideration of the "<u>reasonable</u> preference of the child if twelve (12) years of age or older") (emphasis added).

We recognize that the analysis of statutory best interest factors in this case is atypical because of the severity of the parental alienation found and the stated rejection of Mother by the Children. However, upon careful review of the record, we conclude that the trial court properly considered the best interest factors in modifying the primary residential parent designation from Father to Mother. We emphasize that the trial court's findings as to witness credibility are afforded great weight on appeal. *See Gaskill v. Gaskill*, 936 S.W.2d 626, 633 (Tenn. Ct. App. 1996), *perm. app. denied* (Tenn. Dec. 2, 1997) ("Trial courts are normally in the best position to judge the credibility of the witnesses since they have seen and heard the witnesses testify. Thus, a trial court's determination of credibility is entitled to great weight in this court.") (internal citations omitted).

### C. Statutory Limiting Factors on Residential Co-Parenting Time

Father also contends that the trial court erred by failing to consider the statutory limiting factors on residential co-parenting time contained in Tennessee Code Annotated § 36-6-406(d). Father asserts that Mother had a demonstrated history of mental illness, inconsistency with her own medication, and resistance to keeping the Children on prescribed medication that should have caused the trial court to limit her co-parenting time. Mother argues that although the trial court did not directly address the statutory limiting factors, the court did indirectly address applicable limiting factors within its best

interest analysis, leading to the court's conclusion that limiting Father's residential co-parenting time was in the best interest of the Children.

Inasmuch as the allegations raised by Father within this issue concerning Mother's conduct stem from events occurring prior to entry of the 2015 PPP, we conclude that these allegations were or should have been litigated prior to entry of the 2015 PPP. *See Armbrister*, 414 S.W.3d at 698-99 (explaining that the concept of a material change in circumstance originated with review of "whether the statute empowering courts to modify custody decrees deprived such 'decrees of their quality of finality as adjudications' for purposes of the doctrine of res judicata," with the determination that a custody decree is "'final and conclusive upon all the facts and conditions which existed and upon which the decree was made.'") (quoting *Hicks v. Hicks*, 176 S.W.2d 371, 375 (1943)). We therefore decline to address Father's allegations regarding conduct or instances that occurred prior to June 30, 2015.

Moreover, although the trial court did not expressly cite the statutory limiting factors on residential co-parenting time, we determine that the trial court, in finding severe parental alienation to be a basis for limiting Father's co-parenting time, carefully weighed factor 5 ("[t]he abusive use of conflict by the parent that creates the danger of damage to the child's psychological development") and factor 6 ("[a] parent has withheld from the other parent access to the child for a protracted period without good cause"). *See* Tenn. Code Ann. § 36-6-406(d). When weighing the options going forward, the trial court found that leaving the situation as it was, with Mother afforded the same or reduced co-parenting time as compared to the 2015 PPP, would result, as it had since the October 2015 hearing, in Mother's effective exclusion from the Children's lives. Upon thorough review, we conclude that the trial court did not err in its consideration of the applicable statutory factors.

D. Transfer of Exclusive Custody to Mother with Suspension of Contact with Father

Father contends that the trial court erred by adopting the purportedly most extreme option presented by Dr. Schacht as a recommendation to be followed in the best interest of the Children. In a closely related issue, Father also contends that the trial court erred by including in the 2016 PPP that Father would have no contact with the Children for at least ninety days pending completion of Family Bridges and upon the recommendation of an after-care provider. Father posits that because Dr. Schacht declined to rank one option as superior over the others, the court erred in deciding that the fourth option of granting exclusive custody to Mother, coupled with a period of no contact with Father, would be in the best interest of the Children. We conclude that having made a finding of severe parental alienation, the trial court carefully weighed the options presented by Dr. Schacht

46

in correlation with statutory best interest factors, as explained above, to effect a custody modification in the best interest of the Children.

In his report, Dr. Schacht set forth the following in pertinent part:

Options available to the court for disposition of disputed custody/visitation include at least the following potential courses of action. The sequence of presentation does not imply or reflect any order of recommendation or opinion about feasibility. Pros and cons for each option are discussed in the Appendix [to the report]:

1. Continued custody with [Father].

- With no scheduled visitation or contact with [Mother]; or

- With specific efforts to remedy alienation via education, counseling, and/or parenting coordination, and contact with [Mother] to be determined in conjunction with therapeutic progress; or

- With enforcement of a visitation schedule and with the understanding that any renewed or escalated conflict or other indicator of visitation failure will result in custody reversal.

2. Reversal of custody to [Mother].

- With [Mother] able to arrange physical placement of [the Children] in a neutral setting separate from both parents or with herself, at her discretion;

- With option of no contact with [Father] or paternal grandmother until there is demonstrated and sustained positive progress in [the Children's] relationship with and treatment of [Mother].

When questioned during trial regarding whether he recommended one of the five options he had listed above the others, Dr. Schacht responded:

As a matter of my professional practice, I view the choice among options as the Court's prerogative and I try to stay away from ultimate issue recommendations. I try to lay out what options are and what the pros and cons are and try not to tell the Court what to do.

47

Father relies on this response to posit that the trial court erroneously chose an option that Dr. Schacht had not recommended.  We disagree.

In its memorandum opinion incorporated into the 2016 PPP, the trial court analyzed the potential benefits and drawbacks of each option presented by Dr. Schacht that the court was considering.  The court described the following options:  (1) granting exclusive custody to Father, (2) maintaining Father's status as primary residential parent with efforts to remedy the alienation against Mother, (3) granting exclusive custody to Mother with placement of the Children in a neutral setting, or (4) granting exclusive custody to Mother with no contact between Father and the Children until sustained progress could be demonstrated.  In summarizing these options, the court did not include the option set forth by Dr. Schacht of enforcing visitation with Mother by including a provision that custody would be reversed if such visitation failed, and the court mentioned the option of placing the Children in a neutral setting only in passing.

For the three remaining options closely considered by the trial court, it is helpful to compare pertinent excerpts from Dr. Schacht's description in his report of potential benefits and drawbacks to pertinent excerpts from the court's findings in its 2016 memorandum opinion.

OPTION ONE

Dr. Schacht's Report

**Option 1:**  **Acquiesce to [the Children's] demands, endorse the status-quo and accept the situation as-is, with full custody to [Father], no scheduled contacts with [Mother], and no other court-ordered intervention.**

The primary benefit of this option is avoidance of potential adjustment problems that could arise from mandated change.

It would be unrealistic to select this option based on an expectation that the current parental alienation is something that will spontaneously remit or diminish with the mere passage of time.

[B.M.'s] proximity to the age of majority and his near-future transition to college offer logistical considerations potentially favoring this option in the case of [B.M.].

The primary drawbacks of this option include:

- Judicial reinforcement and reward for [the Children's] extreme beliefs about [Mother] and for [Father's] support of [the Children's] parental alienation.

- Encouragement to manage conflict by avoidance and defiance rather than engagement and effective problem-solving. In turn, this would strengthen [the Children's] dysfunctional sense that they are entitled to unilaterally direct the terms of their relationships with important adults in their lives, with impunity, and would reinforce strategically disrespectful and emotionally extortionate demands as a means of effecting that entitlement.

- [The Children's] loss of the benefit of [Mother's] potential contributions and involvement in their lives.

- Substantial risk that the current parental alienation will endure and become lifelong . . . .

Trial Court's Memorandum Opinion

We talked about Option No. 1, which is nothing is done, simply the boys stay with their father, I think Dr. Schacht phrased it as, "acquiesce to the boys' demands, endorse the status quo and accept the situation as is, with full custody to [Father], no scheduled contacts with [Mother] and no other court-ordered intervention."

And you know, it's kind of interesting because that's kind of what this Court did back in October. . . .

And what was the result? The result was, they had no contact with their mother. She didn't know anything that was happening, nobody bothered to call, she didn't find out about any surgeries, she didn't get any pictures.

* * *

So that's what happens if I leave the status quo as it is. I think we can safely say, that is not going to happen.

49

<u>Dr. Schacht's Report</u>

**Option 2:     Leave primary custody with [Father] and order renewed efforts to remedy alienation via education, counseling, and parenting coordination.**

This could be a reasonable alternative if there was not an established track record of failure or if changed circumstances gave reason to expect success despite past failure.

Because of the apparent support of paternal extended family (grandmother) for the alienation, intervention that included the extended family would be important.

\* \* \*

Notwithstanding long-standing specific recommendations of record that psychological treatment focus on improving the parents' relationship, this goal has not been accomplished to-date.  Indeed, the situation appears to have worsened over time.

Moreover, the history (including [the Children's] participation in the present consultation) suggests that their attitude toward mental health intervention has been shaped by a cynical expectation that mental health professionals are simply allies or obstacles along the path to permanent and total rejection of [Mother].  Mirroring [Father's] perspective, [the Children] approach contacts with mental health professionals as a challenge, the goal of which is to persuade the professionals to believe that their complaints about [Mother] are true and credible.

<u>Trial Court's Memorandum Opinion</u>

Option 2 is leave primary custody with [Father] and order renewed efforts to remedy alienation, be it education, counseling, and parenting coordination.  Here's my problem with that one:  That's what we've been doing for nigh on 16 years.  We've been working on this and working on it and we've been to counselors and therapists and doctors and court and more counselors and different therapists and more doctors and court.  It is a merry-go-round upon which we have all been for many, many years and it

did not work.  I have no reason to believe it's ever going to work in the future.

OPTION FOUR

Dr. Schact's Report

**Option 4:   Place one or both [Children] with [Mother], with temporary suspension of all contact between [Father], his extended family, and [the Children]; suspension of all decision-making authority by [Father]; and future graduated resumption of contact with [Father] and his extended family contingent upon [the Children's] progress in relationship with [Mother] and upon their behavior meeting and maintaining specified conditions.**

This option is essentially an immersion intervention that strives to undo [the Children's] parental alienation by interrupting and insulating them from the paternal dynamics that have helped to maintain the current situation.

The distance between the parties' residences (Texas vs Tennessee) could logistically facilitate this option.

This option would benefit from a detailed court order tying the duration of a no-contact requirement to the quality and progress of repair in the relationship between [the Children] and [Mother].  If this option is selected, a no-contact order should apply to [the Children] as well as to [Father] and his extended family, such that [the Children] should be prohibited from contacting their father and his family except when specified behavioral conditions have been met.  This could reasonably require restrictions on cell phone and internet access, which, in turn, could require coordination with school authorities.  The duration of required no-contact should be sufficient to permit meaningful and real adjustment so that the intervention cannot be thwarted by a shallow "flight into health."  Such an arrangement would convey to [the Children] the court's belief that their rejection and denigration of [Mother] is disproportionate and unwarranted and that the situation is serious, that the status quo is unacceptable, and that change is expected.  This option removes from [the Children's] shoulders the burden of demonstrating loyalty to [Father] by rejecting [Mother].  Under this flipped contingency, [the Children's] current strategy of escalating

51

resistance to [Mother] becomes self-defeating, since access to [Father] would depend upon re-establishing a stable positive relationship with [Mother].

Trial Court's Memorandum Opinion

No. 4 was to place one or both boys with [Mother] with temporary suspension of all contact between [Father], his extended family, and the boys, suspension of all decision-making authority by [Father], and future graduated resumption of contact with [Father] and his extended family contingent upon the boys' progress in relationship with their mother and upon their behavior, meeting and maintaining specified conditions. And that, of course, led us to our discussion about the Family Bridges Program.

I guess Dr. Schacht kind of boiled it down in simple terms: Resum[ing] contact with father under that option would be tied to the quality and progress of the repair in the relationship of the boys with their mother. In other words, instead of rewarding the boys in some way for rejecting their mother, they would be rewarded for accepting their mother by being able to be with their dad.

The trial court thus concluded that the fourth option was the option most likely to result in a change in the pattern of parental alienation and therefore in the best interest of the Children. Father relies on Dr. Schacht's declination to choose an option to assert that "no testimony was given as to the superiority of any option over another." This assertion may be true on its face but solely because Dr. Schacht tempered his explanations of potential benefits and drawbacks with correlations to different desired outcomes. If peace and quiet at the expense of any relationship with Mother were in the best interest of the Children, option one may well have been the best choice. Moreover, the record demonstrates no evidence to support completely excluding Mother from the Children's lives. Likewise, if continuing to attempt enforcement of Mother's co-parenting time with supportive counseling had not been attempted for years or had been demonstrated to be effective in the past, option two may well have been in the best interest of the Children. *See, e.g., Oliver,* 2004 WL 892536, at *5 ("In circumstances where one parent has purposely set out to alienate a child from the other parent, professional assistance from a psychologist or psychiatrist may be required to limit the damage and to prevent it from becoming impervious to improvement. . . . Requiring such counseling in this case would certainly be an appropriate and less drastic measure than changing the current custody arrangements."). However, under the specific circumstances of this case, when counseling had been attempted for several years, we determine that the evidence does not

preponderate against the trial court's finding that it was in the best interest of the Children to modify custody exclusively to Mother and temporarily suspend the Children's contact with Father pending progress as monitored by after-care professionals.[7]

As to the provision in the 2016 PPP suspending contact between Father and the Children, Father contends that such a provision is contrary to the requirement in Tennessee Code Annotated § 36-6-106(a)(2) that the trial court should consider each parent's willingness and ability to "facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents" and the requirement in Tennessee Code Annotated § 36-6-406(d)(6) that the trial court should consider limiting the parenting time of a parent who withholds access to a child from the other parent. As noted in a prior section of this Opinion, the trial court considered these factors when finding that Father had supported the alienation of the Children from Mother and that it was in the best interest of the Children to intervene in this alienation. Father's argument in this regard is unavailing.

## V. Family Bridges

Father also contends that the trial court erred by directing the Children and Mother to participate in Family Bridges and requiring Father to pay the majority of the costs associated with the workshop and required post-workshop "vacation." Having determined that the trial court did not err in modifying custody, we note that "[d]etermining the details of parenting plans is 'peculiarly within the broad discretion of the trial judge.'" *See Armbrister*, 414 S.W.3d at 693 (quoting *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988) (in turn quoting *Edwards v. Edwards,* 501 S.W.2d 283, 291 (Tenn. Ct. App. 1973)). Upon careful review of the record in this case, we determine that the trial court did not abuse its discretion in ordering Mother's and the Children's participation in Family Bridges and requiring Father to pay the majority of the associated costs.

---

[7] We are not persuaded by Father's ancillary argument that the trial court erred by adopting Dr. Schacht's recommendations because Dr. Schacht did not have access to deposition testimony of third parties obtained by Father during prior litigation and admitted as a sealed exhibit in this matter. Dr. Schacht referenced the parties' and the Children's individual recollections of early events in the Children's lives in his report, as well as counseling records from the Children's early years. Moreover, the trial court heard testimony from Mother and Father, often conflicting, regarding such events. The evidence does not preponderate against the trial court's finding in its 2016 memorandum opinion that "the information provided to Dr. Schacht, and upon which his determinations were based, [is] fully sufficient."

Family Bridges came to the trial court's attention through Dr. Schacht's description in his report of how "Option 4," the intervention option eventually adopted by the trial court, would best be facilitated. Dr. Schacht stated in pertinent part:

> [I]f the court selects this option, it would be wise to facilitate the transition with assistance from other professionals with specific expertise. As an initial step, the "Family Bridges" program would be worth considering. The ability of this program to facilitate successful re-unification of alienated children with parents has been documented with systematic follow-up data on a population of alienated children, all of whom previously had failed experiences of outpatient counseling prior to the Family Bridges experience.

Dr. Schacht cited the documentation of "systematic follow-up data" in Richard Warshak, *Parental alienation: What it is: how to manage it*, a presentation delivered to the American Academy of Matrimonial Lawyers – Texas Chapter, as published by the University of Texas School of Law, June 12-13, 2014, at p. 30.

In ordering participation in Family Bridges or a treatment plan with comparable methodology,[8] the trial court relied on Dr. Schacht's court-appointed, expert witness testimony describing Family Bridges as follows in pertinent part:

> Family Bridges Workshop is an intervention intended to facilitate reunification of alienated parents with alienated children. It occurs typically in the context of supportive court orders that are primarily designed to protect the context in which the intervention occurs and reduce the potential for sabotage.
>
> The Workshop consists of a facilitative experience by professionals, who have specific training and experience in doing this, focused on a single family. It's an intensive immersive experience. Occurs over multiple days in an environment that's separate from the ordinary environment that the family is accustomed to.

---

[8] During trial, Mother testified that upon receiving a copy of Dr. Schacht's report prior to trial, she had consulted with Dr. Murphey, who was a leader with Family Bridges and, according to Dr. Murphey's affidavit presented to the trial court, had agreed to develop a "treatment plan" for the Children through Family Bridges if Mother were granted primary custody of the Children. Although the court included in its order the option of Dr. Murphey's working with Mother and the Children through a treatment plan utilizing Family Bridges methodology, by the time that the court entered its order regarding the cost of Family Bridges, the court had received additional logistical information from Dr. Randy Rand, the administrator of Family Bridges. At that time, the court directed Father to advance payment for the Children's and Mother's participation in the actual Family Bridges program.

* * *

> [T]he premise of the Family Bridges intervention is that change requires disruption of the status quo and that, to the extent that the status quo is maintained by contact and communication and support between a parent who in one way or another has played a role in supporting the alienation, disruption of that is important. And so the Family Bridges program seeks to disrupt that cycle by asking for a court order that precludes contact between the alienated child and the parent who is supporting the alienation, for a period of time. And also by reversing the previous contingencies in the sense that, whereas in the past, bad behavior has gotten the child what they want, the reverse contingency is now good behavior gets what you want. So resumption of contact with the preferred parent is contingent on improvement in the relationship with the rejected parent.

Father asserts that because Dr. Schacht had not personally utilized Family Bridges for patients and because the program had not been "tested" in Tennessee, the trial court abused its discretion by ordering participation in Family Bridges. He also asserts that Family Bridges expenses should not be considered health care costs, citing informational materials for the program as describing an "educational" approach. Father thereby argues that the cost of Family Bridges would be an extraordinary educational expense not covered by the description of health care costs provided in the 2015 PPP. We disagree.

The informational materials upon which Father relies demonstrate that Family Bridges, at least as ordered by the trial court, was a therapeutic program designed to intervene in the family dynamic of parental alienation and facilitate reunification of Mother and the Children, as well as to support the Children's mental health. Much of this material, together with documented research, has been published in a peer-reviewed family therapy journal and is referenced by Dr. Schacht in his testimony. We discern no abuse of discretion in the trial court's reliance on such authority or in the court's order directing the parties to participate in Family Bridges in order to facilitate the modification in custody under the circumstances of severe parental alienation found in this case.

In arguing that Family Bridges should be classified as an educational expense, Father cites to an article attached to a document submitted to the trial court on July 22, 2016, by the administrator of Family Bridges, Dr. Randy Rand, upon Mother's counsel's request following entry of the 2016 PPP. The document is an estimate of expenses for the program, updated from an initial estimate submitted to the trial court earlier in July 2016. The article Dr. Rand attached is entitled, "Risks to Professionals Who Work with Troubled and Alienated Parent-Child Relationships," and was published by Dr. Richard

A. Warshak in the *The American Journal of Family Therapy* in 2016. Dr. Rand attached the article to illustrate why the program requires some provisions in court orders designed to protect the safety of professionals working with alienated children. As pertinent to Father's argument, the article includes the following description of Family Bridges:

> The educational workshop Rand designed, Family Bridges ["FB"], is arguably the fountainhead for subsequent programs whose features emulate his contributions. He has inspired and in some cases mentored other's work with abducted and alienated children. After learning about FB's principles and procedures, experienced clinicians have created programs that join elements of the educational workshop with their own contributions. The result is a menu of options for families in need.

> Among the elements that originated with FB and are now part of other programs are the use of educational approaches in contrast to traditional psychotherapy; the use of video edutainment materials to engage children's attention while teaching them important skills in a child-friendly format; moving the intervention out of the professional's office into a leisure setting more conducive to relaxed learning and pleasure; and concentrating the intervention in a few full days rather than hourly sessions spread over months and years.

Richard A. Warshak, *Risks to Professionals Who Work with Troubled and Alienated Parent-Child Relationships*, 44 THE AMER. J. OF FAMILY THERAPY, 111,112 (2016).

Father posits that because the approach taken by Family Bridges is described as "educational" in comparison to "traditional psychotherapy," the expenses for the program cannot qualify as a health care cost and would instead be an extraordinary educational expense affecting child support. *See* Tenn. Comp. R. & Regs. 1240-02-04-.07(2)(d)1.(i) (providing that extraordinary educational expenses, such as private schooling or special needs education, "may be added to the presumptive child support as a deviation"). We find Father's interpretation to be too narrow a reading of the Family Bridges description. As an "innovative approach," *see* Warshak, *Risks to Professionals*, at 112, Family Bridges may be viewed as an alternative to traditional mental health therapy; therefore, the expense is more appropriately classified as mental health treatment rather than an extraordinary educational expense.

Assessing costs for mental health treatment is within the sound discretion of the trial court. *See* Tenn. Code Ann. § 36-5-101(h)(1) (Supp. 2016) ("The court may direct the acquisition or maintenance of health insurance covering each child of the marriage and may order either party to pay all, or each party to pay a pro rata share of, the health

care costs not paid by insurance proceeds."); *see, e.g., Beyer v. Beyer*, 428 S.W.3d 59, 75 (Tenn. Ct. App. 2013), *perm. app. denied* (Tenn. Oct. 16, 2013) (affirming the trial court's judgment directing the father to reimburse the mother for funds she had paid toward the children's "uncovered medical and psychological expenses" when the parties' permanent parenting plan provided that the father would pay "[u]ncovered reasonable and necessary medical, dental, mental health and orthodontic expenses").

As for the post-workshop "vacation," the trial court ordered the parties to pay the applicable expenses because the vacation was a required component of participation in Family Bridges. In his letter to the court, Dr. Rand described this component as an "unstructured," time for the parent and the Children to immediately apply what they had learned in the structured component of the workshop before transitioning into the home environment. According to Dr. Rand, the vacation component is designed to span five to seven days. In its order granting custody to Mother, the trial court included the following provision:

> [F]ollowing completion of the Family Bridges workshop, and before returning home with the children, the custodial parent [Mother] shall take the children on a vacation of no less than five days in duration. The Court expects that the children will apply what they learn during the Family Bridges workshop to improve their interactions with their custodial parent during and following their vacation.

While the trial court was reviewing the logistical details of its ruling at the close of the June 2016 trial, Father's counsel objected to Father's having to pay for any part of Mother's "vacation" expenses. The trial court overruled Father's objection, stating that "it's all part of the program." Inasmuch as the trial court ordered Mother to participate in the vacation component of Family Bridges as part of participation in Family Bridges as a whole, we determine that the vacation component was part of the overall therapeutic expense.

During the close of trial on June 29, 2016, the trial court made an initial oral ruling that Father would be responsible for two-thirds and Mother one-third of the Family Bridges expenses in accordance with their respective incomes. As stated in the 2016 PPP, the court found Father's gross monthly income to be $10,986.50 and Mother's gross monthly income to be $3,650.00. The court's findings regarding the parties' respective incomes are not disputed. In its July 22, 2016, "Order on Payment of Funds for Family Bridges Workshop and Mandatory Post Family Bridges Workshop Vacation, and Airline Flight to Houston, Texas for Children," the trial court directed Father to "cause funds in the amount of $26,000.00 for the Court ordered Family Bridges Workshop plus the estimated $3,000.00 - $5,000.00 for the Family Bridges Workshop required post

57

workshop vacation for [Mother] and the child/ren, to be deposited in the escrow/trust account of [Mother's counsel] as soon as possible." The court further ordered that Mother's counsel was to distribute the funds solely pursuant to the trial court's order. On appeal, Mother does not dispute that Father provided the funds for the Family Bridges expenses as ordered by the trial court.

We note that the amount of the funds Father was ordered to pay for Family Bridges is in accordance with the total estimate of expenses submitted to the trial court by Dr. Rand, rather than two-thirds of that amount, as the trial court had indicated at the close of trial. However, in its subsequent order granting attorney's fees to Mother, entered on August 5, 2016, the trial court stated the following in relevant part:

> The Court has previously ordered the father to pay the majority of the costs and expenses related to the children's participation in the Family Bridges program. These expenses and costs are substantial. For this reason only, the Court does not order full reimbursement to [Mother] of her attorney fees. However, she is entitled to a portion of her attorney fees and the Court finds that [Father] is able to pay a portion thereof. [Father] is ORDERED to reimburse [Mother] $20,000.00. [Mother] shall bear her own costs.

Excluding court reporter and expert witness expenses covered by a separate order, Mother had requested reimbursement in the amount of $38,594.99 in attorney's fees, costs, and expenses. Therefore, pursuant to the trial court's order granting attorney's fees, the court credited Father with up to $18,595.00 that it would otherwise have awarded to Mother in attorney's fees because Father had been ordered to pay the estimated Family Bridges expenses in advance.

On appeal, Father has raised an issue regarding the basis for the "prevailing party fee awards" for the trial court's finding of contempt and has requested that the entire $20,000.00 award be vacated. The maximum amount credited to Father of $18,595.00 subtracted from the maximum amount of $31,000.00 that the trial court directed Father to pay into Mother's counsel's trust/escrow account equals $12,405.00, which is less than half of the amount of the estimated $31,000.00 in Family Bridges expenses. Mother has not raised an issue regarding the interplay of the division of Family Bridges expenses and the award of attorney's fees. She has requested that the trial court's judgment be affirmed in its entirety. *See* Tenn. R. App. P. 13(b) ("Review generally will extend only to those issues presented for review."). We will address Father's argument as it relates to Mother's motions for contempt in a subsequent section of this Opinion. As to the Family Bridges expenses, we conclude that the trial court did not abuse its discretion by directing Father to pay the expenses in advance with a credit to Father for a significant portion of

those expenses in the reduced award of attorney's fees. We therefore affirm the trial court's assessment of Family Bridges expenses to Father.

## VI. Contempt

In its August 5, 2016 "Order on Motions for Civil and Criminal Contempt and Order Granting Attorney Fees," the trial court found Father to be in "willful contempt" of court for violating the 2015 PPP on four counts: (1) failing to notify Mother within twenty-four hours of C.M.'s February 2016 medical hospitalization and treatment, (2) failing to provide Mother with information regarding B.M's academic awards and both Children's academic grades and attendance records, (3) sending disparaging and damaging statements against Mother to B.M. during Mother's co-parenting time in the summer of 2015, and (4) failing to take the Children to court-ordered counseling with Mr. Scott. The court noted in this order that the June 28, 2016 day of trial had been the "final hearing" in the case and dismissed all other contempt allegations with prejudice. As specified by the court, the first two instances of contempt were pled in Mother's June 17, 2016 "Motion for Civil Contempt." The latter two instances of contempt had initially been pled in Mother's October 2, 2015 "Motion for Criminal and Civil Contempt." The trial court in its order stated that it found Father to be in "willful contempt" but did not state whether it found Father to be in civil contempt, criminal contempt, or a mixture of the two depending on the offense.

On appeal, Father does not raise an issue regarding the substantive findings related to his violations of the 2015 PPP. Father breaks down the trial court's order into one finding of civil contempt for the failure to provide Mother with information regarding C.M.'s February 2016 medical hospitalization and three findings of indirect criminal contempt for the other three violations. Father asserts that the court's finding regarding C.M.'s hospitalization was one of civil contempt because Father did provide the information concerning C.M.'s hospitalization to Mother after the twenty-four-hour timeframe required by the 2015 PPP had passed. He argues that because he subsequently had complied with this requirement as far as he could, he had purged any civil contempt resulting from that violation. Father thereby argues that the court should not have found him in civil contempt on this violation. As to the other three violations, Father asserts that the trial court applied a standard of criminal contempt by finding him in contempt for violations he could no longer cure and entering a suspended sentence of eight days in jail. Relying on Tennessee Rule of Criminal Procedure 42(b), Father posits that the court's findings of criminal contempt should be vacated because he was not provided with sufficient notice of how many criminal charges he faced or the potential consequences for such charges.

59

Mother argues that Father waived any objection to insufficient notice on the contempt allegations because he did not object, on the basis of notice, during the June 2016 trial to testimony relevant to the contempt allegations; did not request a special hearing on the contempt allegations; and did not file a response to either contempt motion. Mother acknowledges that Father filed an objection to the June 17, 2016 motion for civil contempt on June 27, 2016, in which he stated that he was entitled to thirty days' notice to respond. *See generally* Tenn. R. Civ. P. 12.01. The final hearing, inclusive of the presentation of evidence relevant to the contempt allegations, was conducted on June 28 and 29, 2016. However, at no time did the trial court set aside a portion of the hearing specifically for presentation of evidence in support of the contempt allegations. We disagree with Mother on this point and determine that Father did not waive the issue of sufficient notice.

Tennessee Code Annotated § 29-9-102(3) (2012) authorizes courts to find a person who willfully disobeys "any lawful writ, process, order, rule, decree, or command" of a court to be in contempt of court. As to punishment for contempt, Tennessee Code Annotated § 29-9-103 (2012) provides in relevant part:

> (a)     The punishment for contempt may be by fine or by imprisonment, or both.
>
> (b)     Where not otherwise specially provided, the circuit, chancery, and appellate courts are limited to a fine of fifty dollars ($50.00), and imprisonment not exceeding ten (10) days . . . .

Under this statutory scheme, a court may utilize the remedy of incarceration for either civil or criminal contempt. *See Ahern v. Ahern*, 15 S.W.3d 73, 79 (Tenn. 2000).

In a case such as the one at bar when the trial court has punished contempt with incarceration but not specified the type of contempt, we look to "[h]ow the trial court utilizes the remedy of incarceration" to determine whether the contempt is civil or criminal. *See State ex rel. Farris v. Bryant*, No. E2008-02597-COA-R3-CV, 2011 WL 676162, at *5 (Tenn. Ct. App. Feb. 24, 2011). As this Court has explained:

> With civil contempt, the court can incarcerate the individual in order to compel performance of the court's order. *Ahern,* 15 S.W.3d at 79. In effect, the contemnor "has the 'keys to the jail' and can purge the contempt by complying with the court's order." *Id.* (citations omitted). In contrast, "[p]unishment for criminal contempt is punitive in character; it is imposed to vindicate the authority of the law." *State ex rel. Everson v. [Gooch]*, 1990 WL 3976, at *1 (Tenn. Ct. App. Jan. 24, 1990). "It is a punitive

proceeding intended to impose a fixed punishment for past actions. Punishment for criminal contempt is not conditional and must be served, even if the contemnor later complies with the court's order." *McLean v. McLean,* No. E2008-02796-COA-R3-CV, 2010 WL 21[6]0752, at *3 (Tenn. Ct. App. May 28, 2010) (quoting *Jones v. Jones,* 1997 WL 80029, at *2 (Tenn. Ct. App. Feb. 26, 1997)); *see also Black* [*v. Blount*]*,* 938 S.W.2d [394,] 398 [(Tenn. 1996)].

*Id.* As to the suspension of a sentence of incarceration, this Court has previously concluded that "[t]here is no such thing as a suspended sentence for civil contempt." *See Mayer v. Mayer*, 532 S.W.2d 54, 60 (Tenn. Ct. App. 1975), *perm. app. denied* (Tenn. Dec. 1, 1975); *see also Hill v. Robbins*, 859 S.W.2d 355, 356 n.2 (Tenn. Ct. App. 1993) ("A trial court which holds a party in contempt may not reserve punishment in futuro.") (citing *Mayer*, 532 S.W.2d 54).

In its August 5, 2016 order, the trial court stated the following regarding the consequences of Father's four acts of contempt found by the court:

> For his willful contempt on four counts, [Father] is sentenced to 8 days in jail. However, the Court gives [Father] one last chance to prove that he can abide by the orders of the Court. If [Father] commits no additional acts of contempt, he will not be forced to serve this sentence and it will be suspended. Should he commit <u>any</u> additional act of contempt, he will serve his time in full.

(Emphasis in original.)

Inasmuch as the trial court specified that the eight-day suspended sentence was the consequence for all four acts of contempt, we determine that the court imposed punishment for criminal contempt on all four counts. *See Mayer*, 532 S.W.2d at 60; *see also Jones v. Jones*, No. 01A01-9607-CV-00346, 1997 WL 80029, at *2 (Tenn. Ct. App. Feb. 26, 1997) (explaining that when determining the "threshold issue" of "whether the contempt is civil or criminal," "[t]he answer turns on the conduct involved and the sanctions imposed, not on the labels of 'civil' or 'criminal' affixed by the parties or the trial court.").

Having determined that the trial court exclusively imposed punishment for criminal contempt in its August 5, 2016 order, we narrow our analysis of Father's issue to

whether he was provided with sufficient notice of indirect criminal contempt charges.[9] Tennessee Rule of Criminal Procedure 42(b) provides in pertinent part:

> (b) **Disposition on Notice and Hearing.** – A criminal contempt shall be prosecuted on notice, except as provided in subdivision (a) of this rule.
>
>> (1) *Content of Notice.* – The criminal contempt notice shall:
>>
>>> (A) state the time and place of the hearing;
>>>
>>> (B) allow the alleged contemner a reasonable time to prepare a defense; and
>>>
>>> (C) state the essential facts constituting the criminal contempt charged and describe it as such.
>>
>> (2) *Form of Notice.* The judge shall give the notice orally in open court in the presence of the alleged contemner or by written order, including an arrest order if warranted. The notice and order may also issue on application of the district attorney general, an attorney appointed by the court for that purpose, or an attorney representing a party in the case.

As this Court has explained:

> Sufficient notice meeting the requirements of due process must be given as a prerequisite to a court's authority to punish a party for criminal contempt committed outside the presence of the court. *Storey v. Storey,* 835 S.W.2d 593, 599-600 (Tenn. Ct. App. 1992). Under Tenn. R. Crim. P. 42(b), a person facing a criminal contempt charge must "be given explicit notice that they are charged with criminal contempt and must also be informed of the facts giving rise to the charge." *Long v. McAllister-Long,* 221 S.W.3d 1, 13 (Tenn. Ct. App. 2006) (citation omitted). "Essential facts are those which, at a minimum, (1) allow the accused to glean that he or she is being charged with a crime, rather than being sued by an individual, (2) enable the accused to understand that the object of the charge is punishment—not merely to secure compliance with a previously existing

---

[9] Pursuant to Tennessee Rule of Criminal Procedure 42(a), a court may impose summary punishment for direct criminal contempt committed in the judge's presence without application of the notice requirements provided in Rule 42(b). *See State ex rel. Farris,* 2011 WL 676162, at *6 n.9.

order, and (3) sufficiently aid the accused to determine the nature of the accusation, which encompasses the requirement that the underlying court order allegedly violated by the accused is itself clear and unambiguous." *Id.* at 13-14.

*McLean*, 2010 WL 2160752, at *5.

In the case at bar, the trial court essentially found Father in criminal contempt for two counts alleged in Mother's October 2, 2015 motion for criminal and civil contempt and two counts alleged in Mother's June 17, 2016 motion for civil contempt. In the October 2, 2015 motion, Mother specifically alleged, as relevant here, that Father had "intentionally and willfully violated" the 2015 PPP by text messaging "disparaging and damaging statements" to B.M. during Mother's summer 2015 co-parenting time and by "intentionally not taking the children to see Mr. Brian Scott, LPC for court ordered counseling." Mother listed specific text messages that she averred were in violation of the order and listed specific actions committed by Father that she averred had kept the Children from seeing Mr. Scott. Although Mother styled the motion as one for criminal and civil contempt, she did not specify which type of contempt she was seeking for specific violations, of which several others were alleged.

Mother did include the following relevant paragraphs in her October 2015 motion regarding the remedy sought:

> [Mother] alleges [Father] was and is capable of complying with this Court's order, but has intentionally not complied with this Court's order and is in willful, intentional and purposeful criminal and civil contempt of Court, as more specifically set forth in the preceding paragraphs. **[Mother] would show that contempt may carry jail time of up to 10 days for each charge. That for criminal contempt, if [Father] cannot afford an attorney one may be appointed to him if he qualifies for a public defender under the income guidelines or as approved by the judge.**

> * * *

> [Mother] prays as follows:

> That an emergency hearing be conducted regarding [Father's] willful contempt of this Court's prior order, and that [Father] be civilly and criminally punished as this Court determines appropriate for his willful and intentional violations of this Court's prior order.

63

(Paragraph numbering omitted; emphasis in original.) Mother also requested attorney's fees associated with bringing the motion. Except for reserving "all other matters" in interim orders, the trial court did not address Mother's October 2015 allegations of contempt prior to the June 2016 trial.

In the June 17, 2016 motion for civil contempt, Mother specifically alleged, as relevant here, that Father had "intentionally and willfully violated" the 2015 PPP by failing to notify Mother within twenty-four hours of C.M.'s medical hospitalization in February 2016 and by failing to provide Mother with information concerning B.M.'s academic awards and the Children's academic grades and attendance records. In this motion, Mother included the following paragraphs relevant to the remedy sought for contempt:

> [Mother] alleges [Father] is in willful civil contempt, for failing to abide by this Court's prior order(s) and should be civilly punished by this Court pursuant to T.C.A. § 29-9-103.
>
> * * *
>
> [Mother] prays as follows:
>
> That [Father] be held in willful civil contempt of court for his willful and intentional failure to abide by the prior order(s) of this Court and punished civilly as this Court determines appropriate.

(Paragraph numbering omitted.)

At the opening of trial on June 27, 2016, the trial court noted that Mother had filed a motion for contempt and that Father had requested to continue Mother's motion. During opening statements, Father's counsel requested a continuance on Mother's June 16, 2016 motion for civil contempt, stating that Father was entitled to thirty days' notice before being required to defend the motion. At the close of trial on June 28, 2016, the trial court noted that in addition to the petition to modify custody before the court, "there [was] also . . . a criminal contempt remaining from last year, a civil contempt from this year . . . ." The court also summarized Mother's testimony regarding the contempt allegations in the June 16, 2016 motion. In its July 18, 2016 order granting custody to Mother, the court stated: "Pending motions for contempt will be addressed by separate order." The court did not address the contempt allegations again until entry of the August 5, 2016 order finding Father in contempt and sentencing him to an eight-day suspended sentence of incarceration. The contempt order indicates that it was entered without

separate hearing. The trial transcripts for October 2015 and June 2016 indicate no oral notice provided to Father of the punishment for criminal contempt.

Upon a thorough review of the record, we determine that Father was not provided with the requisite notice, pursuant to Tennessee Rule of Criminal Procedure 42(b), that he was being charged with criminal contempt for specific violations of the 2015 PPP and was not provided with oral notice by the trial court that he faced possible jail time. Although Mother's October 2015 motion stated that "contempt may carry jail time of up to 10 days for each charge," she failed to enumerate separate charges for which she sought incarceration and appeared to confuse civil and criminal contempt throughout the motion. Mother's June 2016 motion did not mention criminal charges at all. Moreover, the record indicates that the trial court did not give oral notice to Father of possible incarceration until entering the order on contempt in August 2016 and assessing a suspended eight-day sentence impermissible for civil contempt. *See Mayer*, 532 S.W.2d at 60 ("There is no such thing as a suspended sentence for civil contempt.").

We therefore vacate the portion of the trial court's August 5, 2016 order finding Father in contempt and sentencing him to an eight-day suspended sentence. *See, e.g., McLean*, 2010 WL 2160752, at *6 (vacating the trial court's finding of criminal contempt upon determining that the record "raise[d] serious doubts concerning whether [the alleged contemner] clearly understood that the petitions exposed her to incarceration" and that "the trial court failed to provide [the alleged contemner] with proper oral notice about the charges as required by Tenn. R. Crim. P. 42(b)").

In addition, because the trial court indicated in its August 5, 2016 order that its award of attorney's fees to Mother was based on the success of her motions for custody modification <u>and</u> contempt, we remand for a determination of whether the amount of attorney's fees awarded to Mother was appropriate given our vacation of the contempt finding against Father. We note that "attorney's fees are not within the statutory limits to criminal contempt under Tenn. Code Ann. § 29-9-103." *Watts v. Watts*, 519 S.W.3d 572, 585 (Tenn. Ct. App. 2016). As this Court has explained:

> [A]lthough attorney's fees may be a logical and potentially effective part of a sentence for criminal contempt, and the legislature may wish to consider this issue in the future, we do not believe that the legislature has 'specially provided' for attorney's fees as an additional punishment elsewhere under the present statutory provisions.

*Id.*; *see Nichols v. Crockett*, No. E2016-00885-COA-R3-CV, slip op. at *12-13 (Tenn. Ct. App. Sept. 13, 2017). Recognizing that the trial court previously credited Father with his payment of Family Bridges costs against the award to Mother of attorney's fees on her

successful custody modification motion, we expressly do not disturb the trial court's order assessing Father with the cost of Family Bridges.

## VII. NICBC Report

Father also argues that the trial court erred by ordering that a report of the Children's psychiatric hospitalizations be made to the NICBC. Upon Dr. Schacht's recommendation in his report, the trial court entered a supplemental order on August 10, 2016, directing, *inter alia*, that the Children should not have access to weapons/firearms and that a report of their psychiatric hospitalizations would be made to the NICBC. Dr. Schacht's recommendation was based on his opinion that the history in this case indicated "ample warrant" to "impose basic environmental precautions in the form of controlling access to particularly lethal means of harm." Father asserts that because the trial court also credited Dr. Schacht's opinion that suicidal ideation expressed by the Children that prompted their respective 2015 psychiatric hospitalizations was at least in part manipulative, the court could not "have it both ways" by finding the Children to be in possible danger from access to weapons. We disagree.

Contrary to Father's characterization of the trial court's findings, the court clearly indicated, as did Dr. Schacht, that actual suicidal ideation and attempted manipulation of the situation could be occurring in the Children's thought processes simultaneously. Father cites to no authority in support of his argument other than a general reference to the trial court's duty to protect the Children's best interests. We discern no abuse of discretion in the trial court's decision, in the interest of protecting the Children's safety, to report the Children's psychiatric hospitalizations to the NICBC upon the recommendation of a court-appointed expert in forensic psychology who had evaluated the Children.

## VIII. Attorney's Fees on Appeal

Mother requests an award from this Court of her attorney's fees, costs, and expenses incurred on appeal pursuant to Tennessee Code Annotated § 36-5-103(c) (2014), which provides:

> The plaintiff spouse may recover from the defendant spouse, and the spouse or other person to whom the custody of the child, or children, is awarded may recover from the other spouse reasonable attorney fees incurred in enforcing any decree for alimony and/or child support, or in regard to any suit or action concerning the adjudication of the custody or the change of custody of any child, or children, of the parties, both upon the original divorce hearing and at any subsequent hearing, which fees may be

fixed and allowed by the court, before whom such action or proceeding is pending, in the discretion of such court.

Considering Father's success in appealing the finding of criminal contempt and the amount of attorney's fees and costs with which Father was assessed by the trial court, we exercise our discretion to deny Mother's request for attorney's fees on appeal.

## IX. Conclusion

For the reasons stated above, we vacate the portion of the trial court's August 5, 2016 order finding Father in contempt of court and sentencing him to an eight-day suspended sentence of incarceration. We remand for a determination of whether the amount of attorney's fees awarded to Mother was appropriate given our vacation of the contempt finding against Father. We affirm the trial court's judgment in all other respects. Mother's request for an award of attorney's fees on appeal is denied. This case is remanded to the trial court for proceedings consistent with this opinion and collection of costs below. Costs on appeal are taxed one-half to the appellant, Richard Perry McClain, and one-half to the appellee, Ferryl Theresita McClain.

_____
THOMAS R. FRIERSON, II, JUDGE